LUCIETTE C. MCNAMARA[1] & another *vs.* DAVID
HONEYMAN & another.[2]

Suffolk. January 4, 1989. - November 13, 1989.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*University of Massachusetts. Massachusetts Tort Claims Act. Medical Malpractice*, Public employee, Standard of care. *Doctor*, Employment. *Negligence*, Medical malpractice, Psychiatrist, Comparative. *Civil Rights*, Availability of remedy. *Evidence*, Expert opinion, Relevancy and materiality.

For purposes of G. L. c. 258, the Massachusetts Tort Claims Act, it is not material whether the conduct of a public employee constitutes gross negligence or merely ordinary negligence. [46]

The evidence at the trial of negligence claims warranted the jury's conclusion that the individual defendant, a psychiatrist employed by the University of Massachusetts Medical School, was a public employee for purposes of G. L. c. 258, the Massachusetts Tort Claims Act. [47-48]

At the trial of negligence claims the judge correctly ruled that the evidence warranted a finding that the individual defendant, a psychiatrist in a mental hospital, had departed from accepted medical practice by discontinuing one-on-one observation of a schizophrenic patient who, during her hospitalization, had exhibited erratic, self-destructive behavior, and, instead, ordering observation at fifteen-minute intervals, and also a finding that the defendant's negligence was the proximate cause of the patient's death from self-inflicted injuries. [49-52] O'CONNOR, J., with whom WILKINS & LYNCH, JJ., joined, dissenting.

The death of a patient at a State mental hospital, as the result of the alleged negligence of a psychiatrist at the hospital, did not give rise to a Federal civil rights claim under 42 U.S.C. § 1983 (1982) on the theory that the defendants had violated the patient's constitutionally protected interest in reasonable care and safety. [52-53]

Where the plaintiffs did not argue, at the trial of a Federal civil rights claim, that a patient's involuntary commitment to a State mental hospi-

---

[1]Individually and as administratrix of the estate of Karen McNamara, and John C. McNamara. They are Karen's parents.

[2]The Commonwealth.

tal constituted an unreasonable seizure of her person, this contention was not available to them on appeal. [53]

The record of the trial of a civil action did not support a contention that the jury were confused by the number of issues submitted to them. [54]

The jury at the trial of a civil action were properly instructed as to the inferences they were permitted to draw. [54]

At the trial of negligence claims against a psychiatrist, there was no error in the admission of testimony by the plaintiff's expert based on his review of medical records, where he qualified his opinion by stating that he was commenting only on the treatment as documented in the medical records. [54-55]

At the trial of an action arising out of the death of a hospitalized psychiatric patient from self-inflicted injuries, the judge correctly admitted testimony by the patient's boyfriend that, the day before the patient's suicide attempt, he had informed a ward attendant that the patient claimed she had just tried to harm herself, which testimony was offered to show that the hospital staff was alerted to the possibility that she was suicidal. [55]

In an action arising from the death of a hospitalized mental patient from self-inflicted injuries, the judge correctly allowed the plaintiffs' motion for a directed verdict on the issue of the patient's comparative negligence. [55-56]

CIVIL ACTION commenced in the Superior Court Department on March 10, 1983.

The case was tried before *Raymond R. Cross*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Harry L. Miles* (*David C. Kuzmeski* with him) for the plaintiffs.

*Robert V. Deiana* (*Richard C. Van Nostrand & William S. Rogers, Jr.*, with him) for David Honeyman.

*Vincent L. DiCianni*, Special Assistant Attorney General (*Robert J. Kilmartin*, Assistant Attorney General, with him) for the Commonwealth.

NOLAN, J. On December 17, 1980, twenty year old Karen McNamara hanged herself at Northampton State Hospital (hospital). She died almost three months later as a result of her injuries. The plaintiffs claimed, among other things, that Dr. David Honeyman, Karen's psychiatrist, was grossly neg-

ligent when he took Karen off round-the-clock, one-on-one observation and ordered that a staff member check on her every fifteen minutes.

A jury found Honeyman grossly negligent, found the Commonwealth liable for negligence, and found Honeyman and the Commonwealth liable for Karen's conscious pain and suffering and for violation of Karen's Federal civil rights. The jury awarded damages of $1.7 million, including $190,000 in punitive damages against Honeyman.

The trial judge, after considering motions for amending the judgment, new trial and judgment notwithstanding the verdict, entered a judgment[3] of $100,000 against the Commonwealth on the negligence claim. The judge ruled there was insufficient evidence to find Honeyman grossly negligent, and entered judgment notwithstanding the verdict in favor of Honeyman and the Commonwealth on the claims that they violated Karen's Federal civil rights and that Karen suffered conscious pain before her death.[4] The judge left undisturbed the jury's finding, made in response to a special question, that Honeyman was a public employee. Both plaintiffs and defendants appealed to the Appeals Court. We granted Honeyman's petition for direct appellate review. We affirm the judgment.

When acting on the defendants' motions for judgment notwithstanding the verdict, the judge's task, "taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff." *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985), quoting *Rubel* v. *Hayden, Harding & Buchanan,*

---

[3]This was the trial judge's second entry of judgment. The judge had vacated an earlier judgment that incorporated the jury verdict, except that the judge reduced the wrongful death recovery.

[4]Although the plaintiffs listed this claim in their notice of issues on appeal, they did not argue it in their brief. This court need not pass upon questions or issues not argued in the brief. Mass. R.A.P. 16(*a*)(4), as amended, 367 Mass. 921 (1975).

*Inc.*, 15 Mass. App. Ct. 252, 254 (1983). The court will consider whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn" in favor of the non-moving party. *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). The inferences to be drawn from the evidence must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture. *Id.*

1. *Application of the Massachusetts Tort Claims Act.* In analyzing whether the defendant Honeyman is immune from personal liability under G. L. c. 258, commonly referred to as the Massachusetts Tort Claims Act, we must determine whether Honeyman was a public employee. Section 2 of chapter 258 extends immunity from personal liability to public employees who are acting within the scope of their duties. If a defendant is a public employee and his conduct constitutes simple or ordinary negligence, § 2 of chapter 258 clearly applies and the Commonwealth, as a public employer, is liable for the harm and the employee is not liable. The question whether G. L. c. 258 immunizes an employee from gross negligence as well as ordinary negligence has not been answered by our cases to date. Two sections of c. 258 come under review in resolving this issue. Section 2 renders the public employer but not the public employee liable "for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission." Section 10, which provides for exemptions from operation of § 2, among others, states in pertinent part that a public employee shall *not* be immune from "any claim arising out of an intentional tort . . ." It is silent as to gross negligence and hence, we conclude that a public employee *is* immune from a claim arising out of gross negligence because such a claim qualifies as a "negligent or wrongful act or omission" under § 2. Accordingly, it is not material whether Honeyman's conduct constituted gross negligence or merely ordinary negligence for purposes of G. L. c. 258.

On the issue of Honeyman's employment status, we agree with the trial judge that there was sufficient evidence to support the jury's verdict on a special question that Honeyman was a public employee. Honeyman joined the University of Massachusetts Medical School staff in 1980 as a psychiatrist, lecturer and assistant professor of psychiatry. His assignment included providing psychiatric services at the hospital, under a contract between his employer, the University of Massachusetts, and the State Department of Mental Health.

The plaintiffs contend that the University of Massachusetts Medical School is an independent body politic and not a public employer as defined by G. L. c. 258, § 1.[5] The plaintiffs argue that if the University of Massachusetts is not a public employer, Honeyman is not a public employee.

To be deemed an "independent body politic," the university "must constitute an entity in itself and must have an existence apart and distinct from that of the Commonwealth." *Opinion of the Justices*, 334 Mass. 721, 734 (1956). An examination of G. L. c. 75 makes clear that the university is an agency of the Commonwealth and thus is a public employer. Section 8 of c. 75 gives the State Comptroller authority to regulate the university's annual appropriations. The purchasing power of the university's board of trustees is limited by G. L. c. 75, § 13. Employees of the university are designated Commonwealth employees in § 14. The sale and lease of land by the trustees of the university are made in the name of the Commonwealth and are regulated by statute, G. L. c. 75, §§ 25, 26 and 27.

Although the Legislature has empowered the trustees of the University of Massachusetts to establish a group practice at the medical center and to collect fees for medical services (St. 1974, c. 733, §§ 1-7), the medical center is still primarily dependent on the Commonwealth, G. L. c. 75, § 8, and

[5]General Laws c. 258, § 1, defines public employer as "the commonwealth and any county, city, town, educational collaborative, or district . . . and any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof which exercises direction and control over the public employee."

accountable to it in financial affairs. G. L. c. 75, § 10. The medical school has no authority to issue bonds. It cannot sue or be sued in its own name. All of these factors indicate that the university is an agency of the State, and not a separate entity.

The fact that the University of Massachusetts is a public employer does not automatically establish that all its employees are public employees. *Smith* v. *Steinberg*, 395 Mass. 666, 668 (1985). The test for determining whether an individual is a public employee is the same as that used to establish "whether an agent is a servant for whose negligent acts a principal may be liable under the common law doctrine of respondeat superior." *Kelley* v. *Rossi*, 395 Mass. 659, 661 (1985). While physicians exercise independent judgment, a physician can still be deemed a servant where the principal controls the details of the physician's activities. See *id.* at 662.

There was sufficient evidence from which the jury could conclude that Honeyman's employer controlled the details of his activities. Honeyman's superiors regulated his hours. He had no say as to the ward in which he would work or the patients that he would treat, unlike the physician in *Smith* v. *Steinberg, supra* at 669. Honeyman did not have any private patients and his income was not based on the number of patients he treated. The judge correctly left the jury's finding undisturbed.

Because Honeyman was a public employee, the Commonwealth is liable for his negligent conduct under G. L. c. 258, § 2, and the plaintiffs' claim for common law negligence against Honeyman (Count VI) fails. If we agree with the trial judge that the evidence supported a finding that Honeyman was negligent, we need not examine the plaintiffs' additional basis for charging liability against the Commonwealth.[6] Accordingly, we need look only at Honeyman's treatment of Karen.

---

[6]The plaintiffs claimed that the hospital was negligent in allowing patients to use a cubicle without a half wall permitting staff to look in easily

2. *Negligence.* The trial judge ruled that the evidence supported a finding of negligence but did not support the jury's finding of gross negligence. We agree with the trial judge's conclusion. The defendants contest the judge's denial of a motion for judgment notwithstanding the verdict on the finding of negligence. The plaintiffs challenge the judge's denial of their motion to amend his judgment, which asked that jury's finding of gross negligence be reinstated.

The defendants contend that Honeyman was not negligent in his treatment of Karen. The Commonwealth, as a public employer, is liable under G. L. c. 258, § 2, if the jury reasonably found that there was a duty owed to Karen, that there was a breach of such duty by Honeyman, that injury resulted from the breach and that a causal connection existed between the breach and the injury. *Dinsky* v. *Framingham*, 386 Mass. 801, 804 (1982).

The standard of care required of a psychiatrist is consistent with that of a medical practitioner. *Stepakoff* v. *Kantar*, 393 Mass. 836, 840 (1985). The psychiatrist must exercise the same degree of skill and care as is exercised by the average qualified practitioner in that specialty, taking into account the advances in that profession and the resources available to the physician. *Id.* at 840.

Karen was diagnosed as schizophrenic at age seventeen, when she was admitted to a state mental hospital for the first time. Over the next three years she displayed a pattern of relatively calm behavior followed by periods of violence against herself and others. When she became extremely disruptive and self-destructive, she would be admitted to the hospital, which was the most restrictive mental health facility available in her area.

Her fifth and final admission to the hospital began on Thanksgiving Day in 1980, after she attempted to harm herself by digging a fork into her wrist while on a home visit. A

---

and in placing an electrical conduit along the ceiling of that cubicle. Karen hanged herself with a bedsheet that she wedged into a gap between the conduit pipe and the ceiling.

week earlier, she had slashed her wrist with a piece of broken glass. The staff at the adolescent mental health center where she had been living concluded they could not risk taking care of Karen when she was "suicidally active."

During this final hospital admission, Karen continued her pattern of erratic behavior. Upon her arrival, the admitting doctor ordered one-on-one observation of Karen to prevent her from commiting suicide. The following day, November 28, 1980, after Karen told Honeyman she did not intend to kill herself, he reduced the precautions to staff checks every fifteen minutes. Later that day, she took the flip top from a can of soda and cut her neck superficially. She was returned to one-on-one observation by another member of the staff.

On December 2, 1980, Honeyman again reduced the level of observation to fifteen-minute checks for Karen, noting that Karen had stated she did not intend to harm herself. She bolted from the ward later that day just as the door was un-locked. Security employees returned her to the ward and the staff ordered one-on-one observation for Karen.

For the next two weeks she remained in one-on-one obser-vation status. During this period of time, Karen made several attempts to harm herself by punching windows, banging her head on the bed and trying to cut or choke herself. She was also abusive to the staff, both orally and physically. When she became difficult to control, the staff put her in wrist-and-ankle restraints until she calmed down. This happened on five occasions between December 3 and 14, 1980.

The afternoon of December 16, Karen's boy friend visited her and then informed a hospital staff member that Karen claimed to have attempted suicide that day. Whether or not Karen actually had attempted suicide, the jury reasonably could infer that Honeyman was on notice that she again might attempt suicide. *Poirier* v. *Plymouth*, *supra*.

On the morning of December 17, Karen attended the Hill Program for adolescents. She returned to the hospital in the afternoon, where she presented herself, unasked, at a staff meeting attended by Honeyman. Although she seemed anx-ious and distressed, she was sent away. Within a half hour,

she hanged herself. Sometime after Karen was found hang-
ing, Honeyman inserted a notation into her medical records,
which he dated December 16, stating, "No intent for self
harm. No recent incidents. Future oriented."

Honeyman testified that he changed Karen's status on De-
cember 16, the day before she hanged herself, from one-on-
one observation to fifteen-minute checks. He said he based
his decision on the fact that Karen's behavior had been rela-
tively stable since December 8, which he stated was the last
time that she was restrained for concerns about danger-
ousness.

Although Karen had twice tried to choke herself using a
candy cane and a cigarette on December 11, Honeyman tes-
tified that he did not consider them to be true suicide at-
tempts. He also cited her promise not to harm herself and
her willingness to enter treatment at a program for adoles-
cents as indications that the less restrictive status was
appropriate.

The plaintiffs' expert, Dr. Michael Nelson, testified that
Karen's behavior, as described in the records, was out of con-
trol throughout her stay at the hospital. He stated that he
would not consider Karen to be stabilized unless she had two
or three weeks of consistent, safe behavior, during which she
harmed neither herself nor others. Nelson testified that be-
cause Karen's behavior was out of control, the fifteen-minute
checks, which Honeyman ordered, were not sufficient to
manage her condition. He stated that, in his opinion, the
death was preventable if Karen had been kept on the close
scrutiny of one-on-one observation. A juror could, then, have
inferred from Dr. Nelson's testimony that Honeyman's negli-
gence in failing to keep Karen on one-on-one observation was
the proximate cause of her death.

The judge relied upon Dr. Nelson's testimony in conclud-
ing that the jury could find that Honeyman was negligent.
We think that Nelson's testimony, fairly read, when consid-
ered with the other evidence in the plaintiffs' favor concern-
ing Karen's behavior and condition, warranted a finding that
Honeyman deviated from accepted medical practice expected

of a psychiatrist in these circumstances by removing Karen from one-on-one observation.

3. *Civil rights.* The plaintiffs challenge the trial judge's entry of judgment notwithstanding the verdict on their claim that Honeyman and the Commonwealth violated Karen's civil rights. To establish a claim based on 42 U.S.C. § 1983,[7] a plaintiff must show that the conduct complained of was committed by a person acting under color of State law and that the conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. *Miga* v. *Holyoke,* 398 Mass. 343, 349 (1986). *Parratt* v. *Taylor,* 451 U.S. 527, 535 (1981), overruled on other grounds, *Daniels* v. *Williams,* 474 U.S. 327 (1986). The plaintiffs primarily asserted Karen's rights under the Fourteenth Amendment to the United States Constitution as the basis for their claim. *Youngberg* v. *Romeo,* 457 U.S. 307, 324 (1982) (involuntarily committed patient in state institution has constitutionally protected interest in reasonable care and safety).

As the trial judge correctly ruled, the Commonwealth is not a "person" under § 1983. *Woodbridge* v. *Worcester State Hosp.,* 384 Mass. 38, 44 n.7 (1981), and cases cited. Since the day on which the case was argued, the United States Supreme Court has decided that neither a State nor a State official acting in his official capacity is a person under 42 U.S.C. § 1983. See *Will* v. *Michigan Dep't of State Police,* 109 S.Ct. 2304 (1989). In addition, the Commonwealth did not waive its immunity under the Eleventh Amendment to the United States Constitution by the passage of the Massachusetts Tort Claims Act, G. L. c. 258. *Irwin* v. *Commis-*

---

[7]Title 42 U.S.C. § 1983 (1982), provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

*sioner of the Dep't of Youth Servs.*, 388 Mass. 810, 821 (1983).

"[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss or injury to life, liberty or property" (emphasis in original). *Appleton v. Hudson*, 397 Mass. 812, 818-819 (1986), quoting *Daniels v. Williams*, 474 U.S. 327, 328 (1986). The plaintiffs argue that simple negligence is enough to state a claim for violation of Federal civil rights when a special relationship exists between the defendant and the victim. The special relationship here is that of physician and patient. The United States Supreme Court has already examined claims in that context and found simple negligence to be an inadequate basis for a claim that constitutional rights have been infringed. *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). The conduct must amount to "deliberate indifference." *Id.* at 104. Generally, Federal courts have held that even gross negligence falls short of "deliberate indifference." *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987).

On appeal, the plaintiffs argue that Karen's right under the Fourth Amendment to the United States Constitution to be secure against unreasonable seizure of her person was violated because she was involuntarily committed to the hospital. The plaintiffs made very brief mention during the trial that they were asserting rights under the Fourth, Fifth and Fourteenth Amendments. They concede that the issue was not specifically presented to the jury. While their pleading listed the Fourth Amendment as one source of Karen's constitutional rights, there was no reference to Karen's being unconstitutionally "seized" in their motion for directed verdict, their request for jury instructions or their special jury questions. Some evidence about the nature of Karen's commitment was introduced, but because the seizure issue was not argued at trial, we shall not consider it on appeal. *Leardi v. Brown*, 394 Mass. 151, 155 (1985).

4. *New trial.* The defendants charge that the trial judge made several errors in his instructions to the jury and in his evidentiary rulings. We have examined each claim of error

and conclude the judge did not abuse his discretion and properly denied the motions for a new trial.

First, it was not prejudicial error to send every issue to the jury. Judicial economy is promoted when a trial judge, in a case in which it is a close question whether the standard for directed verdict is met, allows a matter to go to the jury. *Smith* v. *Ariens Co.*, 375 Mass. 620, 627 (1978).[8] The defendants contend the jury was confused by the number of issues, as evidenced by the fact it took seven days of deliberations to reach a verdict. The length of time the jury deliberated is not enough to show confusion. The jurors in this case were assisted by special questions[9] and their answers to those questions were not internally inconsistent.

The defendants also claim that the judge improperly instructed the jury on the inferences they could draw. In both instances, the inferences were reasonable[10] and were qualified by statements that the jurors were not required to draw those inferences. The instructions were fair. *Pfeiffer* v. *Salas*, 360 Mass. 93, 100 (1971).

The judge committed no error in admitting the testimony of the plaintiffs' expert, Dr. Nelson, and in admitting hearsay

---

[8]As this court pointed out in *Smith* v. *Ariens Co.*, *supra* at 627-628, if a judge errs in granting judgment notwithstanding the verdict, then the jury verdict can be reinstated.

[9]The defendants contend that the questions on civil rights were improperly worded and that the judge erred in allowing the jury to consider two separate claims for wrongful death. Any error in the questions was corrected by the trial judge in his judgment notwithstanding the verdict. The questions were not, however, so inaccurate as to mislead the jury.

[10]The judge instructed the jury that it could infer that Honeyman acted out of consciousness of liability when either on or after December 17, 1980 (the day of Karen's suicide attempt), he inserted a note dated December 16 into Karen's medical records: "No intent for self harm. No recent incidents. Future oriented." False or inconsistent statements can be considered as indicating consciousness of liability. See *Sheehan* v. *Goriansky*, 317 Mass. 10, 16 (1944). The judge also instructed the jury that it could infer from the lack of an entry in the "team book" for December 15, 1980, that no team meeting occurred. See *Johnson* v. *Wilmington Sales, Inc.*, 5 Mass. App. Ct. 858 (1977). See also Proposed Mass. R. Evid. 803(7) (absence of entry into records of regularly conducted activity admissible to prove nonoccurrence of event).

testimony offered by the decedent's boy friend. The Commonwealth argues that Dr. Nelson's opinion lacked a foundation because it was based solely on a review of medical records. Dr. Nelson qualified his opinion, however, by stating that he was commenting only on the treatment as documented in the medical records. In this case, the source of the expert's opinion goes to its weight, not its admissibility. See *Bernier* v. *Boston Edison Co.*, 380 Mass. 372, 381 (1980).

The Commonwealth also challenges the admission of testimony that on December 16, 1980, Karen's boy friend informed an unnamed ward attendant who let him out of the locked ward that Karen told him she had just tried to choke herself with a towel. This statement was admitted to show that hospital staff had been alerted to the possibility Karen was suicidal, and not to show that Karen actually tried to harm herself. See *Seelig* v. *Harvard Coop. Soc'y*, 355 Mass. 532, 540 (1969).

Finally, there is no merit in the defendants' claim that the judge erred in allowing the plaintiffs' motion for a directed verdict on the issue of Karen's comparative negligence. Mentally ill people who are capable of forming an intent and who actually do intend an act that causes damage will be held liable for that damage. *McGuire* v. *Almy*, 297 Mass. 323, 328 (1937). It follows that a mentally ill person can be comparatively negligent in some circumstances. See *id.* This court has not before examined the question of comparative negligence arising out of conduct for which a person has been hospitalized or committed. We join a number of courts in holding there can be no comparative negligence where the defendant's duty of care includes preventing the self-abusive or self-destructive acts that caused the plaintiff's injury. *Cowan* v. *Doering*, 111 N.J. 451, 462 (1988), and cases cited. Clearly, the duty of care that the defendants owed to an institutionalized patient such as Karen McNamara included taking reasonable steps to prevent her suicide when it was a known or foreseeable risk. To allow the defense of comparative negligence in these circumstances would render meaningless the duty of the hospital to act reasonably in pro-

tecting the patient against self-harm. *Cowan, supra* at 467. Accordingly, the Superior Court judge did not err in allowing motions for directed verdict as to Karen's alleged comparative negligence.

*Judgment affirmed.*

O'CONNOR, J. (dissenting, with whom Wilkins and Lynch, JJ., join). The primary question in this case is whether the evidence was sufficient to warrant a finding that negligence on the part of the defendant Honeyman caused or contributed to cause the suicide of Karen McNamara. The court has concluded that the testimony of the plaintiffs' expert, Dr. Michael Nelson, "fairly read, when considered with the other evidence in the plaintiffs' favor concerning Karen's behavior and condition, warranted a finding that Honeyman deviated from accepted medical practice expected of a psychiatrist . . . by removing Karen from one-on-one observation," and that that deviation "was the proximate cause of her death." *Ante* at 51. I do not agree.

The court characterizes Karen's conduct on several occasions as "self-destructive," and informs us that, at least twice, members of the hospital staff placed her on one-on-one observation. She was on one-on-one observation from December 2, 1980, until Honeyman removed her from that status on December 16. It is not entirely clear what importance the court attaches to that evidence, or to the further evidence that, on December 16, Karen's boy friend informed a hospital staff member (not shown to have been Honeyman or to have passed the information along to Honeyman) that Karen had claimed to have attempted suicide that day. Also, it is unclear what significance the court attributes to the evidence that, shortly before her death, Karen presented herself to a staff meeting attended by Honeyman and, "[a]lthough she

seemed anxious and distressed, she was sent away."[1] In any event, that evidence does not pass the test for sufficiency set out in *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968) and its progeny. See *Stepakoff* v. *Kantar*, 393 Mass. 836, 840 (1985). Surely, the recited evidence, unsupplemented by adequate expert testimony, would not have warranted the jury in finding that Honeyman, in removing Karen from one-on-one observation, or in failing to predict and prevent Karen's suicide, failed to exercise the degree of skill and care customarily exercised by the average qualified psychiatrist in the circumstances.

The court's expressed conclusion that Nelson's testimony in conjunction with other evidence supports the finding of negligence implies, if it does not explicitly state, the court's recognition that Nelson's testimony was critical. Therefore, fair appellate review demands careful analysis of Nelson's testimony, a type of analysis, I suggest, that is not present in the court's opinion.

Nowhere in his testimony did Nelson even suggest that, in Honeyman's treatment and supervision of Karen, and aside from record-keeping, Honeyman deviated from accepted medical practice. Nelson did not testify, either explicitly or implicitly, that Honeyman had failed to treat Karen with the skill and care that would have been exercised by an average competent psychiatrist. Rather, as is demonstrated by the following excerpt from the record, Nelson focused on what he perceived to be Honeyman's faulty record-keeping. He testified that "good medical practice" requires documentation of many kinds of information including information about the level of patient supervision required from time to time and about the reasons for changing the intensity of supervision whenever changes are deemed appropriate. He also testified that Honeyman's documentation fell below the stan-

---

[1] The testimony by a treatment team member named Walsh was that, while the team was engaged in a meeting at the east end of a nurse's station, Karen came to the door, and that someone opened the door and asked her to wait. The record is bereft of evidence that Honeyman saw Karen or was made aware of her presence.

dard of "good medical practice," and that the reason good documentation is required is that the patient receives care from a variety of people working at different times of the day, and close, accurate communication between them is essential. Nelson testified on direct examination as follows:

Q. "In your opinion, did Dr. Honeyman's treatment of Karen McNamara, *as documented*, comport with good medical practice?"

A. "*As documented*, no."

Q. "What is your basis for that opinion?"

A. "Examination of the record."

Q. "What in the record led you to conclude that his treatment of Karen McNamara, *as documented*, did not comport with good medical practice?"

A. "There was no admission history by Dr. Honeyman. Review of her previous record. There was no treatment plan. There was no regular review of the treatment plan. There was no consistent pattern of recorded observations in the progress notes. There was no recorded discussions by the staff concerning Dr. Honeyman's decisions to change observational status. There was no assessment documented according to the rationale in many cases from one status to another. There was no documentation of the steps that should have been established prior to Karen McNamara's discharge to the Hill Program and there was no documentation of her status on return."

Q. "Now, do you also have an opinion, sir, as to whether Dr. Honeyman's failure to comport with good medical practice contributed to Karen McNamara's death?"

A. "Yes."

Q. "What is that opinion?"

A. "His failure to comport to good medical practice, *as documented*, did contribute to her death."

Nelson also was asked, "Do you have an opinion as to the extent of Dr. Honeyman's deviation from good medical practice?" Nelson answered, "*As documented*?" The plaintiffs'

counsel said, "*As documented.*" Nelson answered, "Significant."

On cross-examination, the following questions were asked and answers given:

Q. "If it were a fact, whether it was documented or not in the record, that the team meetings that were held three times a week during Karen's admission, if it were a fact that her behavior and condition and treatment and plans for her treatment in the future were discussed at those team meetings, would that tend to change that opinion about Dr. Honeyman's treatment?"

A. "That would tend to change my opinion, with a proviso."

Q. "With a proviso?"

A. "Yes, That proviso is that documentation is part of good medical practice."

Plaintiffs' counsel carefully inquired of Nelson about Honeyman's treatment of Karen "as documented," and Nelson's answers were expressly limited in the same way. Indeed, when, on one occasion, counsel asked whether Nelson had an opinion about whether "Dr. Honeyman's failure to comport with good medical practice contributed to Karen's death," Nelson answered, "yes," and, when asked for that opinion, his answer was that Honeyman's "failure to comport to good medical practice, *as documented,* did contribute to her death" (emphasis added). Nelson supplied the limitation that had been omitted from the question. As the court acknowledges in its "New trial" discussion, *ante* at 55, "Dr. Nelson qualified his opinion . . . by stating that he was commenting only on the treatment as documented in the medical records."

One point must be made crystal clear. Nothing in Nelson's testimony remotely suggests that there was information in the hospital records that demonstrated Honeyman's negligence. Rather, Nelson's testimony can only reasonably be understood to mean that, if the treatment and supervision actually given were limited to what was contained in the records, and one were to conclude that Honeyman had failed

to take an admission history, had failed to review prior records, had failed to establish a treatment plan, had failed to regularly observe the patient, and had had no discussion with the staff, because those events were not documented, then his performance did not comport with good medical practice. Such testimony does not help the plaintiffs because there was no evidence that Honeyman's performance was limited to whatever was recorded in the hospital charts. Surely, the jury would not have been warranted in inferring from Honeyman's recording failures that he had not established a treatment plan or done other undocumented things. Even if Honeyman's testimony as to all he had done were disbelieved by the jury, the jury could only have speculated as to whether Honeyman had failed with respect to treatment or had failed with respect to record-keeping only. Neither the court nor anyone else suggests, nor could fairly suggest, that the jury would have been warranted in finding that Honeyman's negligent record-keeping had anything to do with Karen McNamara's suicide.

The court's reasoning, as set forth in its opinion, with respect to the question of the sufficiency of the evidence to establish Honeyman's negligence, is brief. The court notes, *ante* at 51, Nelson's testimony that, "as described in the records," Karen's behavior was out of control throughout her hospital stay, that Nelson would not consider her stabilized in the absence of two or three weeks of consistent safe behavior, that fifteen-minute checks were "not sufficient to manage her condition," and that Karen's death was "preventable" if Karen had been kept on one-on-one observation. The court concludes, *ante* at 51, without reference to any other expert testimony, that "[a] juror could, then, have inferred from Dr. Nelson's testimony that Honeyman's negligence in failing to keep Karen on one-on-one observation was the proximate cause of her death." Certainly, it is true that the jury properly could have found that, had Karen been kept on one-on-one observation status, the suicide probably would not have occurred. The critical flaw, however, in the plaintiffs' case and in the court's determination, is that Nelson did not tes-

tify that Honeyman's decision to remove Karen from one-on-one observation fell below the standard set by the average competent psychiatrist. See *Stepakoff* v. *Kantar*, 393 Mass. 836, 840 (1985); *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968). Nelson focused, not on negligence in treatment, but on causation only. Surely, the unhappy fact that, as things turned out, fifteen-minute checks "were not sufficient to manage [Karen's] condition," that is, to keep her from committing suicide, does not permit the conclusion that Honeyman's management of Karen was less than ought to be expected of an average competent psychiatrist. Surely, also, the jury could not reasonably have interpreted Nelson's testimony as measuring Honeyman's conduct against the *Brune* v. *Belinkoff* standard.

The evidence was insufficient to warrant a finding of Honeyman's negligence except, perhaps, with respect to record-keeping. The evidence was insufficient to show any causal connection between faulty record-keeping and Karen McNamara's death. No other adequate evidence of negligence attributable to the defendant hospital is demonstrated in the court's opinion, and I am unaware of any. No other ground for recovery against either defendant has been established. Therefore, I would reverse the judgment and order judgment for the defendants.