Gants, J.
Late in the evening of January 21, 1991, the plaintiff, Carolyn Hohenleitner, suffered an angina attack while at home with her granddaughter. She took nitroglycerine tablets, which brought temporary relief. Just before midnight, her pain became more intense and, this time, her symptoms were not alleviated by taking more nitroglycerine tablets. Believing that she had just suffered her second heart attack, Hohenleitner called 911 shortly after midnight on January 22. She was taken by ambulance to the Emergency Room at Quincy Hospital (“the Hospital”), arriving at roughly 12:35 a.m. Upon her arrival, she was interviewed by the registered nurse in charge of triage, Linda Ferrag. Hohenleitner did not see a doctor until 1:17 a.m. While giving a medical history to that doctor, she suffered a cardiac arrest. Later that morning, she suffered a second cardiac arrest. Hohenleitner survived but her heart was irreversibly damaged.
*32 Hohenleitner filed suit against the defendant Quorum Health Resources, Inc. (“Quorum”), who managed Quincy Hospital pursuant to a Contract for Professional Services (“the Contract”),[1] claiming that Quorum was vicariously liable for Nurse Ferrag’s negligence in failing to provide her with proper emergency room care. Hohenleitner does not claim that Quorum itself was negligent in its supervision of Nurse Ferrag; her sole basis for Quorum’s liability is respon-deat superior. Neither Ferrag nor Quincy Hospital was named as a defendant in the suit.
Quorum moved for summary judgment, arguing that, as a management company that provided Quincy Hospital only with administrative services, it cannot be held vicariously liable for the independent medical judgment of a nurse employed by Quincy Hospital. After review, Judge Thomas S. Connolly denied the motion for summary judgment, “both as a matter of law and as a matter of discretion.” He wrote, “This case on the agency issue is close... The Court believes that the case should be tried on the merits, and the Court can re-entertain these arguments, if appropriate, on a Motion J.N.O.V. In that way, there will be ONE trial and ONE appeal.” (Emphasis in original.) 
Trial commenced on February 23, 1999. At the close of the plaintiffs case, this Court expressly reserved decision on Quorum’s motion for a directed verdict, which was based on essentially the same ground as its motion for summary judgment. This Court, like Judge Connolly, believed it wiser to allow the case to be decided by the jury so that there would be no need for a retrial and decide the agency issue, if still ripe, in the context of a motion for judgment notwithstanding the verdict. See generally Feltch v. General Rental Co., 383 Mass. 603, 611 (1981) (“The better procedure ‘in a case in which it is a close question whether the standard for granting a directed verdict is met is to allow the matter to go to the jury. If the judge then decides that the jury’s verdict cannot stand, a motion for judgment notwithstanding the verdict may be allowed’ ”), quoting Smith v. Ariens Co., 375 Mass. 620, 627 (1978).[2]
On March 4, 1999, the jury rendered a special verdict in which it found:
1. that Nurse Ferrag was negligent;
2. that her negligence caused injury to the plaintiff;
3. that Hohenleitner was entitled to damages totaling $2,655,660;
4. that Hohenleitner was not comparatively negligent; and
5. that Quorum had “the right or the power to control or direct the manner in which Nurse Linda Ferrag provided treatment to patients in the Emergency Room at Quincy Ciiy Hospital.”
In view of the jury’s verdict, Quorum now moves for judgment notwithstanding the verdict under Mass.R.Civ.P. 50(b). For the reasons stated below, the motion for judgment notwithstanding the verdict is ALLOWED. Judgment shall enter for the defendant Quorum.
DISCUSSION
I. The Standard of Review in Motions for Judgment Notwithstanding the Verdict
The standard of review in evaluating the defendant’s motion for judgment notwithstanding the verdict under Mass.R.Civ.P. 50(b) was set forth by the Supreme Judicial Court in Cambridgeport Savings Bank v. Boersner.
In considering a motion for judgment notwithstanding the verdict, “the judge’s task, ‘taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.’ ” Tosti v. Ayik, 394 Mass. 482, 494, 476 N.E.2d 928 (1985), quoting Rubel v. Hayden, Harding & Buchanan, Inc., 15 Mass.App.Ct. 252, 254, 444 N.E.2d 1306 (1983). The court will consider whether “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn” in favor of the nonmoving party. Poirier v. Plymouth, 374 Mass. 206, 212, 372 N.E.2d 212 (1978), quoting Raunela v. Hertz Corp., 361 Mass. 341, 343, 280 N.E.2d 179 (1972). ‘The inferences to be drawn from the evidence must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture.” McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 706-07 n. 3, 563 N.E.2d 188 (1990), quoting McNamara v. Honeyman, 406 Mass. 43, 45-46, 546 N.E.2d 139 (1989).
413 Mass. 432, 438 (1992).
II. The Elements of Negligence and Causation
Applying that standard, I find that, viewing the evidence in the light most favorable to the plaintiff, there was sufficient evidence for the jury reasonably to conclude that Nurse Ferrag was negligent. Nurse Ferrag admitted in her testimony that the standard of care for a triage nurse required her to assume that a patient coming into the emergency room with chest pain is having a heart attack unless that possibility is medically ruled out. She admitted that an electrocardiogram (“EKG”) should be given in order to confirm or rule out a heart attack. There is no dispute that an EKG was given to Hohenleitner, that the results of the EKG were immediately available, that a triage nurse should be able to interpret those results, and that a review of the EKG would immediately have revealed that Hohenleitner was having a heart attack. Nurse Ferrag contended that the EKG was given to Hohenleitner at 12:45 a.m.; Hohenleitner recalled that it was not given until later. The medical records permit one to conclude reasonably that the EKG was given *33 either at 12:45 a.m. or after 1:00 a.m. If the jury found that the EKG was not given until after 12:45 a.m., the jury reasonably may have found, based in part of the expert testimony of Nurse Barbara Wynter, that Ferrag’s delay fell below the standard of care. If the jury found that the EKG was given at 12:45 a.m., then the jury still reasonably may have found, based on Wynter’s expert testimony and Ferrag’s own admissions, that Ferrag’s conduct fell below the standard of care since she should have learned immediately from the EKG that Hohenleitner was having a heart attack but no doctor was summoned until at or just before 1:17 a.m.[3] In short, the jury was justified in finding that Nurse Ferrag was negligent either in failing promptly to provide Hohenleitner with the EKG, failing promptly to interpret it accurately, or failing promptly to summon the emergency room doctor.
Viewing the evidence in the light most favorable to the plaintiff, there was also sufficient evidence for the jury reasonably to conclude that Nurse Ferrag’s negligence caused injury to the plaintiff. There was testimony from the plaintiffs expert in internal medicine and cardiology, Dr. Kenneth Tucker, that the delay in seeing a physician caused delay in diagnosing and treating Hohenleitner’s heart attack, and that, with heart attacks, “time is muscle,” meaning that heart muscle is lost while a heart attack is allowed to continue. While it is difficult to determine with precision the amount of additional damage to Hohenleitner’s heart that was caused by the delay resulting from Nurse Ferrag’s negligence, the jury was justified in crediting Dr. Tucker’s testimony that the delay increased the damage to her heart, causing her irreparable injury.
III. Vicarious Liability
The far more difficult question is whether the evidence was sufficient to find that Quorum was vicariously liable for Nurse Ferrag’s negligence. It is undisputed that the City of Quincy first contracted with HCA Management Company, Inc. (which later became Quorum) in 1981 after the Federal Housing Authority, as a bonding condition, required the City to retain professional, private management for Quincy Hospital. Under Quorum’s Contract with the City, Quorum agreed to act as manager of the Hospital. Contract at §1.1. As manager, Quorum “shall have authority and responsibility to conduct, supervise, and manage the day-to-day operations of the Hospital . . .’’ Contract at §1.2. Among Quorum’s specific responsibilities were:
[t]he supervision and management of all employees of the Hospital, including the determination from time to time of the numbers and qualifications of employees needed in the various departments and services of the Hospital . . . [and] [t]he establishment, revision and administration of wage scales, rates of compensation, employee benefits, rates and conditions of employment, in-service training, attendance at seminars or conferences, staffing schedules, and job and position descriptions with respect to all employees of the Hospital . . .
Contract at §1.2(b).
[t]he evaluation of all quality control aspects of the Hospital operation, and the implementation, with Board approval, of quality control programs designed to meet standards imposed by appropriate certifying agencies and to bring about a high standard of health care in accordance with Board policies and resources available to the Hospital.
Contract at § 1.2(h).
Under the Contract, Quorum provided the Hospital with the following personnel, all of whom were to remain Quorum employees and be paid by Quorum but served at the pleasure of the Hospital’s Board of Managers:
1. a chief hospital administrator who was the Director of the Hospital and its chief administrative officer;
2. a chief financial officer who was the chief accounting and financial officer of the Hospital;
3. a controller who was the accounting manager of the Hospital;
4. a patient accounts manager; and
5. an associate director for patient services.
Contract at §2. In return, the City of Quincy paid Quorum $769,000 in 1989, increased each year by a percentage determined by the consumer price index. Contract at §6.
The Medical Staff of the Hospital consisted of independent physician groups. According to the Contract, “[a]ll medical and professional matters shall be the responsibility of the Board of Managers and the Medical Staff of the Hospital.” Contract at §3.2. Nurses were not part of the Medical Staff of the Hospital; they were City of Quincy employees under the direction of the Director of Nursing, another City employee.
Even viewing the evidence in the light most favorable to the plaintiff, Quorum may not be found to be Nurse Ferrag’s employer; the City of Quincy was plainly her employer. The City paid her salary and benefits, scheduled her hours of work, provided the facilities and equipment she needed to perform her job, and received payment for the services she provided to patients. Quorum received no benefit from her work; it was paid a fixed fee in accordance with the Contract. Therefore, this Court need not decide the difficult question of whether the employer of a nurse is vicariously liable for her negligence committed while acting in the scope of her employment, because Quorum was plainly not Nurse Ferrag’s employer. Compare Burroughs v. Commonwealth, 423 Mass. 874, 877 (1996), and Restatement (Second) of Agency, §219, with Gugino v. Harvard Community Health Plan, 380 Mass. 464, 468 (1980). See also Memorandum of *34 Decision and Order on Defendant Shields Healthcare Group Inc.’s Motion for Summary Judgment, Miller et al. v. Kurkjian et al., 9 Mass. L. Rptr. 591 (February 19, 1999) (Gants, J.) (analyzing the alternative legal formulations for vicarious liability in medical malpractice cases).
I find, based on the undisputed evidence, that the five Quorum administrators provided to manage the Hospital under the Contract were borrowed servants who should be viewed, with respect to the duties they performed for the Hospital, as servants of the City of Quincy. See Galloway’s Case, 354 Mass. 427, 430 (1968); Restatement (Second) of Agency at §227.
It is well settled that one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become as to that service the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired ... It is not decisive that he was paid by the one whose general servant he is . . . And it is not decisive whether the one to whom he is lent or hired actually exercises control, if he has the right to do so.
Galloway’s Case at 430. The evidence is undisputed that each of the five borrowed Quorum employees were initially appointed by the Hospital’s Board of Managers and were permitted to continue in their positions at the pleasure of the Board. It was the City, not Quorum, who had the right to exercise control over the performance of their managerial duties on behalf of the Hospital. While the five were provided by Quorum and paid by Quorum, once they assumed their jobs at the Hospital, they answered only to the Hospital Board of Managers and remained in their positions only with the approval of the Board. See Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 622 (1990) (“Whether a person employed by one entiiy becomes a loaned servant of another entity to perform services for that entiiy usually depends on whether the employee remained subject to the control of the original employer, or answered only to the second entiiy”).
Since the five Quorum employees were essentially lent (actually, leased) to the City of Quincy to provide Hospital managerial services, they were no longer servants of Quorum with respect to their Hospital duties but servants of the City. See Galloway’s Case at 429-30; Restatement (Second) of Agency at §227. Therefore, the City, not Quorum, could be held vicariously liable for their conduct. Since Quorum was no longer vicariously liable for the conduct of its own borrowed employees, it could not be vicariously liable for the conduct of Nurse Ferrag.
The plaintiff argues the converse — that, since Quorum administrators managed the Hospital, all Hospital employees, including Nurse Ferrag, were servants lent to Quorum. This argument fails on two grounds. First, Quorum never had the exclusive right to control Hospital employees, including Nurse Ferrag. For instance, Nurse Ferrag remained under the direction and supervision of a nurse manager, the associate director of nursing, and the director of nursing, all City employees.[4] Second, under §3.2 of the Contract, the Quorum administrators did not have responsibility for medical and professional matters; those remained in the sole province of the Board of Managers and the Medical Staff of the Hospital.
Apart from mirroring the reality, categorizing the five Quorum administrators as borrowed servants of the Ciiy also places vicarious liability where it belongs — on the City. It does not make sense that a patient at a municipal hospital like Quincy Hospital is limited by the $100,000 cap under the Massachusetts Tort Claims Act, G.L.c. 258, §2, if the Hospital retains employees to perform its managerial and administrative functions but can evade the cap if the Hospital retains persons employed by an outside management company simply by suing the outside company on a vicarious liability theory. Treating the retained administrators as borrowed servants means that the municipal liability cap is not affected by a municipality's decision whether to staff these positions with City employees or with outside professionals.[5]
However, one need not rely on the characterization of the Quorum administrators as borrowed servants to find that Quorum cannot be held vicariously liable. At the very least, Quorum was an independent contractor that the Ciiy contracted with to provide hospital management services. All parties at trial agreed that, as an independent contractor, Quorum was vicariously liable for Nurse Ferrag’s negligence only if it had the right or the power to control or direct the manner in which she provided treatment to patients in the Emergency Room at Quincy Hospital. See generally Gugino v. Harvard Community Health Plan, 380 Mass. at 468; Harnish v. Children’s Hospital Medical Center, 387 Mass. 152, 159 (1982). Even viewing the evidence in the light most favorable to the plaintiff, I do not find the evidence sufficient to support such a finding. Pursuant to its Contract with the Ciiy of Quincy, Quorum could implement quality control programs with the approval of the Board of Managers, organize in-service training, and ensure compliance with Hospital policies but it could not, as a matter of law, professional obligation, and contract, control or direct medical decisions regarding patient care since none of the five Quorum administrators at Quincy Hospital was a licensed physician or nurse.
Under G.L.c. 112, §74, a registered nurse must pass an examination offered by the Board of Registration and be licensed by the Board. “Each individual licensed to practice nursing in the commonwealth shall be directly accountable for the safety of nursing care [she] delivers.” G.L.c. 112, §80B. See also 244 *35 C.M.R. §3.02 (a registered nurse shall bear full and ultimate responsibility for the quality of nursing care she provides). Anyone who practices or attempts to practice professional nursing without being licensed is in violation of the law of this Commonwealth. G.L.c. 112, §80.
These statutory obligations naturally have shaped the standard of care of registered nurses. Every medical witness who testified, including Nurse Ferrag herself, declared that the standard of care for a registered nurse required her to make independent nursing judgments, and not to permit those judgments to be directed or controlled by anyone who was not a physician or a nurse. There is no dispute that the five Quorum administrators managing the Hospital could not lawfully have directed or controlled the clinical care provided by any nurse to any patient, and there was no evidence that any of the five had ever attempted to move beyond administration into the forbidden realm of directing or controlling clinical medical care. In the context of this case, no Quorum administrator lawfully could have directed or controlled Nurse Ferrag’s triage decisions in the Emergency Room or the nursing care she provided to Emergency Room patients. Nor did they try. If they had tried, Nurse Ferrag had a legal and professional obligation to ignore their direction and make her own independent nursing judgments. The most any Quorum administrator could do was enforce Hospital policy, but there was no evidence that Nurse Ferrag violated any Hospital policy in providing clinical care to Ms. Hohenleitner or anyone else.
This legal and professional obligation was reflected, albeit imperfectly, in Section 3.2 of the Contract, which provided that “(a]ll medical and professional matters shall be the responsibility of the Board of Managers and the Medical Staff of the Hospital.” While the Medical Staff included only physicians and not nurses, the intent and spirit of this provision was plainly to exclude the Quorum administrators from participation in clinical judgments regarding the care of Hospital patients and to protect Quorum from any legal claim that it bore responsibility for a clinical misjudgment.
In short, there is no evidence that reasonably permits a finding that Quorum could have directed or controlled the manner in which Nurse Ferrag provided nursing care to patients in the Emergency Room. Pursuant to statute, the standard care of registered nurses, and Quorum’s contract with the City, the Quorum administrators were barred from directing or controlling the provision of such care and, if they dared to tiy, Nurse Ferrag had a legal and professional obligation to ignore their direction and exercise her own independent clinical judgment.
I am mindful that the Supreme Judicial Court, in the context of determining whether University of Massachusetts staff psychiatrists were “public employees” under the Tort Claims Act, have found that the right to control a psychiatrist’s working hours, the ward he works in, and the patients he treats are relevant considerations in determining whether the Commonwealth exercised direction and control over his activities. See McNamara v. Honeyman, 406 Mass. 43 (1989); Hopper v. Callahan, 408 Mass. 621, 634 (1990); Williams v. Hartman, 413 Mass. 398, 400-01 (1992). However, in each of these cases, the psychiatrist had a superior, the Medical Director, who was an employee of the Commonwealth and retained the power to supervise the work of the psychiatrist and ensure its quality. Since that Medical Director, himself licensed as a psychiatrist, could lawfully direct and control clinical decisions made by the psychiatrist, it was reasonable to permit a finding that the Commonwealth, through its employee, had the power to direct and control the psychiatrists’ activities. In the instant case, Quorum employed no one at Quincy Hospital who could involve herself in any clinical decision. Therefore, clinical decisions were beyond Quorum’s right or power to control or direct.
Since Quorum’s vicarious liability rests solely on the finding that it had the right or power to control or direct the manner in which Nurse Ferrag provided treatment to Emergency Room patients, the insufficiency of evidence to support this finding means that the judgment against Quorum cannot stand.
ORDER
For the reasons stated above, Quorum’s motion for judgment notwithstanding the verdict is ALLOWED. In accordance with this decision, judgment shall enter for the defendant Quorum, without costs.

 The Contract was actually between the City of Quincy and HCA Management Company, Inc., Quorum’s predecessor in interest.

 The decision to reserve decision on the motion for a directed verdict was even easier in this case since the defense did not call any witnesses.

 Nurse Ferrag admitted that the doctor, who was in the emergency room at the time, would have come as soon as possible if he were told that a patient was having a heart attack.

 In Cahill v. HCA Management Co., Inc., the Fourth Circuit found HCA, on the basis of a management agreement with a hospital similar to that between Quorum and Quincy Hospital, to be vicariously liable for the negligence of a medical technician in the performance of a venapuncture because the hospital had “lent” the medical technician to HCA. 812 F.2d 170 (4th Cir. 1986). The Court made this finding because it concluded that the hospital did not select the technician nor supervise his work. Id. at 171. In the instant case, however, hospital employees veiy much supervised Nurse Ferrag’s work. Indeed, in the chain of command, Quorum administrators “supervised” Nurse Ferrag’s work only at the ethereal level of the Director of Quincy Hospital, who “supervised” all 1,200 hospital employees.

 Since hospital management companies would insist on indemnification for such vicarious liability in any contract it signed with a municipality, the practical result of permitting *36 vicarious liability in cases like this would be that a municipality would effectively lose the benefit of the $100,000 cap whenever it brought in outside administrators. This would likely be a prohibitively high cost to pay for the benefits yielded by outside, professional hospital management.