Fishman, J.
Plaintiff Frank Melanson, individually and as administrator of the estate of his deceased wife May Melanson, brought this action against the defendant William Damon, M.D. (“Dr. Damon”) for damages incurred as a result of Dr. Damon’s allegedly negligent care and treatment of May Melanson. Dr. Damon has moved for summary judgment on the grounds that, at all times relevant to this case, he was acting as a public employee subject to the direction and control of a public employer, the University of Massachusetts Medical Center (“UMMC”), and as such he is immune from liability under G.L.c. 258, §2. For the reasons set forth below, the defendant’s motion is DENIED.
I. BACKGROUND
The undisputed material facts, and the disputed facts viewed in the light most favorable to the non-moving party, are as follows.
From approximately 1960 until 1979, Dr. Damon maintained a private family medical practice at an office on 235 Green Street in Gardner. Dr. Damon’s wife was the owner of the property at 235 Green Street from the early 1960s through approximately 1999. At no time was there any written rental agreement between Dr. or Mrs. Damon and the UMMC regarding the use of the 235 Green Street office as a UMMC facility.
In 1979, Dr. Damon entered into a contract of employment with the UMMC Department of Family and Community Medicine. Since that time, he has served as an Assistant Professor of Family and Community Medicine at the University of Massachusetts Medical School (“UMMS”) while continuing to practice medicine at 235 Green Street. Since the early 1980s, Dr. Damon held his practice out to the public as “Gardner Family Practice” (“GFP”). A sign outside 235 Green Street read “Gardner Family Practice” in large letters, and then in smaller letters the sign read “An Affiliate of the University of Massachusetts Medical School.” As a condition of his employment, Dr. Damon was required to participate in the UMMC’s Group Practice Plan, whereby all monies collected from patients were deposited into a UMMC account for purposes established by the Trustees of the UMMC.
Dr. Damon was paid by the UMMC based upon on a fixed salary determined by Dr. Lynn Eckhert (“Dr. Eckhert”), the Chair of the Department of Family and Community Medicine. Dr. Damon’s salary was not dependent upon the number of patients he treated. Dr. Damon also received compensation for certain non-UMMC positions he held, including Director of Gardner Manor Nursing Home and Co-Director of Harvard Medical School’s PRI-MED course. Additionally, Dr. Damon was an attending physician at Heywood Hospital in Gardner, a hospital that was not owned by UMMC.
Dr. Damon participated in the Commonwealth’s contributory retirement plan, and he also received health, dental, and life insurance benefits offered to employees of the Commonwealth. Dr. Damon was required to obtain Dr. Eckhert’s approval when he wanted to take vacation and personal time. However, Dr. Eckhert did not regulate Dr. Damon’s daily sched *111 ule. Dr. Damon testified that he himself determined the hours he worked, and that Dr. Eckhert simply agreed with the schedule Dr. Damon had set up.[2]
Dr. Damon’s primary responsibility as an Assistant Professor at UMMS was as the Director of the Clerkship in Family and Community Medicine. Dr. Damon held this position from 1980 through 1994. Dr. Damon established the curriculum for the students, and he helped to evaluate their performance. The Clerkship, which every UMMS student was required to take, lasted for six weeks. At any one time, there were ten to fourteen UMMS students participating in the Clerkship. Between one and four UMMS students per year did their Clerkship at the GFP, under the supervision of Dr. Damon.
Under the terms of his employment contract, Dr. Damon was required to abide by the policies, rules and regulations adopted by the UMMC’s Board of Trustees. However, Dr. Damon stated in his deposition that the only UMMC policy that he incorporated into his practice concerned the UMMC’s use of competitive interviewing for hiring employees. When asked whether the manner in which he carried out his clinical practice changed at all after he became a UMMC employee in 1979, Dr. Damon replied: “No. I had already been in practice over 20 years by then, about twenty years, so I didn’t do much changing.” Dr. Damon exercised independent judgment in his treatment of patients, including Mrs. Melanson. According to Dr. Eckhert’s deposition testimony, it would be Dr. Damon’s decision whether or not to treat all of the patients who came to see him at GFP. Occasionally, a private physician unaffiliated with UMMC would refer a patient to Dr. Damon for treatment.
Dr. Eckhert exercised some degree of supervision over Dr. Damon, but much of this occurred in the context of Dr. Damon’s role as a member of the faculty at UMMS, and not in his role as a practitioner of family medicine at GFP. Dr. Damon was required to attend regularly-scheduled faculty meetings of the Department of Family and Community Medicine. Although Dr. Eckhert signed off on Dr. Damon’s clinical privileges, Dr. Damon testified that he never actually used those privileges at any time during the course of his career, and that his family medicine practice at GFP was in no way dependent upon whether or not he had UMMC clinical privileges. Likewise, when asked whether his clinical performance was ever evaluated by anyone from UMMC, Dr. Damon’s response was: “My first thought is no.” Dr. Damon did complete a summary of his activities at the end of each year that was reviewed by Dr. Eckhert, but the activities contained in this summary were limited to “teaching and administrative duties.” Dr. Damon stated that it was “very rare” for him to discuss actual patient care with Dr. Eckhert.
Since approximately 1967, Dr. Damon treated Mrs. Melanson and other members of her family at the GFP office on 235 Green Street. In late 1995 and early 1996, Mrs. Melanson saw Dr. Damon at GFP on multiple occasions and complained of recurrent fever, fatigue, weight loss, and pain. In late January 1996, Dr. Damon admitted Mrs. Melanson into Heywood Hospital in Gardner. A CT scan revealed an abscess in the buttocks with gas in the soft tissues. On or about February 2, 1996, Mrs. Melanson was transferred to the UMMC for a surgical procedure. Mrs. Melanson was found to have extensive necrotizing fascitis, and she died shortly after undergoing surgery. Frank Melanson subsequently brought this action against Dr. Damon, alleging that his negligent treatment of Mrs. Melanson in late 1995 and early 1996 resulted in severe personal injuries and wrongful death.
II. DISCUSSION
Summary judgment is appropriate where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 643-44 (2002), citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991): see also Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis, 410 Mass. at 716. When the non-moving party bears the burden of proof on an issue for which summary judgment is sought, that party must oppose the motion with admissible evidence on the issue in order to defeat the summary judgment motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When presented with a motion for summary judgment, the court must consider the evidence in the light most favorable to the non-moving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995).
Dr. Damon contends that he was a public employee of the Commonwealth at all times relevant to this action, and that therefore he is immune from liability under the provisions of the Massachusetts Tort Claims Act (“MTCA”). Under G.L.c. 258, §2, “[N]o . . . public employee shall be liable for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment.” Whether an individual is a public employee is a question of fact. Williams v. Hartman, 413 Mass. 398, 400 (1992), citing Rowe v. Arlington, 28 Mass.App.Ct. 389, 391 (1990).
The parties agree that the UMMC is a “public employer” under the MTCA. See McNamara v. Honey *112 man, 406 Mass. 43, 47 (1989); Robinson v. Commonwealth, 32 Mass.App.Ct. 6, 9 (1992). However, the fact that the UMMC is a public employer does not conclusively establish that all of its staff members are “public employees” entitled to the protection of the MTCA. McNamara, 406 Mass. at 48, citing Smith v. Steinberg, 395 Mass. 666, 668 (1985). Rather, the key inquiry “is whether a person is subject to the direction and control of a public employer.” Smith, 395 Mass. at 667, citing Kelley v. Rossi, 395 Mass. 659, 661 (1985). The Supreme Judicial Court has noted that the very nature of a physician’s function suggests that in most instances, the physician will be considered an independent contractor, and not a public employee. Williams, 413 Mass. at 400-01; see also Kelley, 395 Mass. at 662.
“A physician is not necessarily a public employee simply because a public entity pays his or her salary, provides a retirement fund, or manages a vacation schedule.” Williams, 413 Mass. at 400. Rather, the Court must focus on whether the public employer controls the details of the physician’s day to day activities and the physician’s treatment of the patient. See id. at 400-01. Relevant factors for the Court to consider include whether the defendant had control over his hours of work, where he worked, and which patients he would treat, whether his income was based on the number of patients he treated, and whether he also held staff appointments at private hospitals during the relevant time frame. Smith, 395 Mass. at 669.
Viewing these factors in the light most favorable to the plaintiff, summary judgment would be inappropriate in this case. A juiy could reasonably find, based on the factual record,[3] that Dr. Damon exercised significant discretion in his day-to-day practice at GFP, and that any supervision on Dr. Eckhert’s part was limited to Dr. Damon’s academic duties as an Assistant Professor of Family and Community Medicine at UMMS. It is noteworthy that a number of courts have declined to grant summary judgment to UMMC staff members in situations either factually analogous to this case or where the record indicated a greater degree of UMMC direction and control than that which is present in the case at bar. See, e.g., Brooks v. Khan, Civil No. 982532C (Worcester Super.Ct. Oct. 31, 2001) (Locke, J.) (14 Mass. L. Rptr. 109); Moran v. Caulkins, Civil No. 971310 (Worcester Super.Ct. Dec. 19, 2000) (Butler, J.) (12 Mass. L. Rptr. 667); Mahoney v. Bors-Koefoed, Civil No. 96-666A (Worcester Super.Ct. May 24, 2000) (Toomey, J.) (11 Mass. L. Rptr. 608); Maloney v. Herrmann, Civil No. 951809B (Worcester Super.Ct. Mar. 23, 1998) (Fecteau, J.). This Court finds that whether UMMC had direction and control over Dr. Damon’s actions at the time of his allegedly negligent treatment of Mrs. Melanson remains a disputed issue of material fact, and, accordingly, summary judgment must be denied.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant William Damon, M.D.’s motion for summary judgment be DENIED.

 Indeed, Dr. Eckhert testified that she did not know what time Dr. Damon arrived at his office each morning, nor did she know what time he left his office each day.

 The affidavits submitted by Dr. Damon and Dr. Eckhert are, at times, inconsistent with their deposition testimony as to the extent of Dr. Damon’s discretion at GFP. It is for the jury, and not this Court, to resolve these inconsistencies.