Fabricant, J.
INTRODUCTION
This action arises from a dispute over second-hand smoke. The plaintiff, Joanne Donnelly, alleges that the defendant Cohasset Housing Authority has failed to respond adequately to her complaints regarding infiltration into her apartment of smoke from her downstairs neighbor’s apartment. Based on this allegation, she asserts claims of negligence, breach of contract, breach of the covenant of quiet enjoyment, and discrimination on the basis of handicap. Presently before the Court is the defendant’s motion for summary judgment on all counts of the complaint. For the reasons that will be explained, the motion will be allowed.
BACKGROUND
The evidence offered, considered in the light most favorable to the plaintiff, provides the following factual background.[1] 'Hie plaintiff is a tenant in an elderly housing complex operated by the defendant Cohasset Housing Authority. Her lease lists “Management Responsibilities,” including the following: “A. To permit Resident to quietly and peaceably enjoy the leased premises”; “H. To maintain the leased premises and the development in decent safe and sanitary condition, and to comply with the requirements- of Chapter II of the State Sanitary Code and other local, state or federal codes regulating residential premises”; “H. 4. To maintain structural elements (such as walls, ceilings, floors, windows, doors, stairways, elevators, and foundations) in good repair, weatherproof, and free of cracks and holes"; “I. To make emergency repairs to defects which it determines pose an immediate and serious threat to health and safety of the Resident’s household . . . forthwith”; “J. To make a good faith effort to complete all other repairs within thirty (30) days of Resident’s notification to Management of such defect.”
The plaintiff does not smoke and does not allow smoking in her apartment. In January 1999, Mildred Nardo, a smoker, moved into the apartment directly below the plaintiff. Soon thereafter, the plaintiff complained to the Housing Authority that smoke from Nardo’s apartment was infiltrating into her apartment through the walls and floors. The defendant sent a maintenance worker who installed foam sealant in orifices around pipes and under electrical outlet cover plates in both apartments. He also installed an exhaust fan in Nardo’s apartment, in a location under a sliding door leading to the plaintiffs deck. The maintenance worker made two trips to complete these tasks, one in January and one in May 1999. The fan was under Nardo’s control; the admissible evidence does not indicate the extent to which she used it.
The plaintiff was not satisfied, and continued to complain that smoke from Nardo’s apartment was adversely affecting her health. The Housing Authority proposed various solutions, including moving the plaintiff to another apartment, and providing her with a voucher under the federally-funded “section 8" program, so as to facilitate her obtaining private housing. The plaintiff rejected these proposals on the grounds that the same problem might recur if she moved to another apartment in the complex, and that section 8 housing would increase her costs.[2]
A series of communications ensued between attorneys for the plaintiff and the Housing Authority. Sometime in 2000, the plaintiff, through her counsel, requested that the floor of her apartment be “sealed.”[3] The Housing Authority declined in a letter dated October 16, 2000, taking the position that, based on documentation submitted, “it has not been established that smoke is coming into the apartment through the floors or that sealing the floors would obviate your client’s complaints.” The parties engaged the services of a community mediation program, without success. In the course of mediation (the record is unclear on when), the plaintiff for the first time asserted that the “door sweep” on the door leading from the common hallway into her apartment was broken.[4] The Housing Authority did not fix the door sweep. In an answer to an interrogatoiy it asserts that it offered *319 to do so and the plaintiff declined; the plaintiff provides no evidence to contradict that assertion.[5]
The plaintiff enlisted assistance from the Cohasset Board of Health. According to a letter from Joseph Godzik, health agent for the Board, to the Housing Authority, dated November 9, 2000, he inspected the plaintiffs apartment on October 30, 2000.[6] He “did not observe any violations to Chapter II of the State Sanitary Code.” Nevertheless, he offered certain recommendations, including installation of “an air purification system with a HEPA filter in the unit,” and “caulk areas where the baseboard has separated from the floor.” His final recommendation was as follows: “Because of the apparent poor condition of the floor (slight sagging in numerous areas), smoke could enter the unit through separations in the sub floor joints. Placing an impervious barrier such as polyethylene under the carpet could help reduce smoke infiltration.” The Housing Authority did not adopt these recommendations.
Plaintiffs counsel then sent a letter of presentment under the Massachusetts Tort Claims Act, G.L.c. 258, §4, dated February 26, 2001. The letter asserted claims of breach of contract, negligence, discrimination on the basis of handicap, and breach of the right to quiet enjoyment. Counsel demanded monetary damages and “effective subsequent modifications or other smoke free accommodations.” He did not specify the accommodations sought, but asserted that the Housing Authority had acted unreasonably in failing to “seal many of the holes and cracks,” to “inspect and evaluate obvious defects in the floor or floor insulation,” and to replace the door sweep, and in installing the fan under the plaintiffs sliding door and giving her no means of turning it on.
The Housing Authority undertook to conduct an inspection to evaluate the problem. Randy Waters, identified as “a construction advisor from the Bureau of Housing Construction,” visited both apartments on March 26, 2001.[7] The plaintiff was present, as was health agent Joseph Godzik. Waters reported, in his subsequent letter to the Housing Authority, that he had “check[ed] for cracks at walls and ceilings,” “check(ed) wall and ceiling penetration (outlets, light switches and fixtures),” “used asmoke pencil to check on drafts and air flow,” and “check(ed) building blueprints for possible framing contribution.” At his deposition, he elaborated that he had “looked all around the apartment. . . looked on the perimeter, looked for cracks in the walls, cracks in the floors, holes in the walls, holes in the floors, loose outlets, . . . checked the whereabouts of their ventilation system, looked at the light fixtures. I had smoke pencils which I use to see where the smoke would travel . . . looked at the doors, the windows to see if there was gaps in the doors and the windows, any kind of opening.”
Waters found, according to his letter to the Housing Authority, “that there was no direct link from one unit to the other ... I found nothing unusual with the two units. They both had a balance air flow and pressure system . . . There was normal air exchange that you might find in any multi-unit stacked development. There is no direct flow of air or smoke connected between these two (2) units.” At his deposition, he was asked whether he had observed any holes or cracks. He responded “nothing out of the normal.” Normal, he indicated, would be “stress cracks in the walls, gaps underneath doors.” Asked whether the plaintiffs door had a gap, he responded that she had a threshold and weather stripping, and that the condition of the weather stripping was “decent.” Waters further testified that he did not conduct any tests to determine the presence of cigarette smoke.
Health Inspector Godzik reported his observations of the testing in an affidavit, asserting that he “did not observe any obvious violations of Chapter II of the State Sanitary code, nor did I smell any tobacco smoke in the apartment at any time that I was in the apartment.” After Water’s inspection, the Housing Authority replied to Godzik’s November letter and recommendations in a letter dated March 29, 2001. The Housing Authority relied on Water’s results as indicating the lack of any need for repairs or “structural or construction modifications” to the apartment. With respect to his recommendation of an air purification system, the Housing Authority responded that it “does not provide or pay for individual household appliances,” and suggested the possibility of funding from Medicaid or some other source.
The plaintiff filed her verified complaint in this action on June 12, 2001. Her allegations include the following: “After Mildred Nardo took possession of the downstairs apartment, second hand cigarette smoke began seeping into the plaintiffs apartment through cracks and holes in the walls, floors, doors and stairwell, causing great discomfort and harm to the Plaintiffs health and safety.” Thereafter, “[cjigarette smoke continued to enter the plaintiffs apartment through defective walls, floors, doors and stairwell, causing the Plaintiff to suffer physical and emotional harm . . .” “The door sweep on the plaintiffs door connecting the plaintiffs apartment to the common hall remains broken, with half of the sweep missing, despite notice and request for replacement.” “(S]he is compelled to spend winter nights with the windows open and in the summer is unable to use her porch and in other cases must vacate the premises altogether.” The complaint seeks compensatory and punitive damages and declaratory and injunctive relief, including an order that the Housing Authority “designate one or more buildings as non-smoking.”
In support of her allegations of defective conditions causing smoke infiltration, the plaintiff offers the following. The plaintiff testified at her deposition that she smelled cigarette smoke in and near her apartment, although she did not see smoke coming into her *320 apartment. She acknowledged other odors as well, giving as an example that the downstairs tenant before Nardo used to bum incense, and that smell “used to come up.” Five individuals who have visited the plaintiffs apartment assert in affidavits, all dated in May of 2001, that they have smelled cigarette smoke in the plaintiffs apartment. One of these affiants, Phyllis Dangora, indicates that she smelled cigarette smoke in the hall leading to the apartment, as well as in the apartment, and that on one occasion “during the summer before last” the smell of smoke on the deck outside the apartment was “so sickening that we had to go back into the apartment.”[8]
The plaintiff relies also on deposition testimony of Randy Waters, in response to the question “is it possible that air from the downstairs apartment will find its way upstairs into the upstairs apartment,” that “it’s possible, sure.” She also cites the opinion of Joseph Godzik, as recounted supra, that “smoke could enter the unit through separations in the sub floor joints.” The broken door sweep, she also suggests, could allow smoke to enter under the door from the common hallway.
Finally, the plaintiff offers a report, dated February 24, 2003, of Covino Environmental Associates, Inc.[9] The report recites that a representative of that firm visited the plaintiffs apartment on February 21,2003, and performed “air flow visualization testing ... in order to observe air flow patterns at the front door . .. and to determine whether the apartment was under negative or positive pressure with respect to the adjacent corridor. Air flow visualizations at the floor and/or wall base also were performed in the kitchen and in front of the bathroom entrance.” According to the report,
[A]ir flowed from the adjacent corridor into Apartment #16 through a gap at the top edge of the front door and from below the apartment through a small crack located underneath the tile floor in a comer of the kitchen. Testing performed along the sides and lower edge of the front door, behind the cove base in the kitchen and under the carpeting in front of the bathroom, did not indicate air flow into or out of Apartment #16. Based on these air flow visualization testing Apartment #16 appeared to be under negative pressure with respect to the adjacent corridor and possibly with respect to the space below the apartment. Based on Covino’s observations, the front door appeared to be slightly warped and misshapen in comparison to the doorframe. A visible gap exists along the top edge of the door, where air flow from the adjacent corridor into Apartment #16 was observed.
No evidence indicates that the Housing Authority was ever notified of a gap at the top edge of the door or a crack under a tile in the kitchen.[10]
With respect to the condition of the plaintiffs health, the record provides the following. A report of Dr. Aidan Long, dated August 13, 1999, indicates that he evaluated the plaintiff on that date. She complained to him of symptoms dating to Januaiy 1999, consisting of “sore throat, headaches, ocular itching, ocular tiredness, tendency to rub her eyes . . . nocturnal wakening because of nausea and a burning pain in her stomach together with the itchy eyes and sore throat ... on some occasions ... a left-sided chest pain and a sensation of difficulty breathing ... all accompanied by a tobacco taste in her mouth.” Dr. Long’s examination of the patient produced no positive findings. “Spirometric evaluation” of her breathing “was completely normal.” Dr. Long conducted allergy tests, which identified allergies to cats, dust mites, and grass pollens. He gives his assessment as follows: “I believe that the patient is suffering from a mild degree of allergic rhinitis related to indoor exposure to dust mite allergens. . . . Allergic inflammation of the nasal airways and upper respiratory tract can give rise to non-specific reactivity such that every day exposures can prove to be significant irritants such as cigarette smoke.” Dr. Long reports having given the patient instructions “to minimize dust mite exposure,” and prescribed a nasal spray “to decrease any existing inflammation.” He concludes that “[i]f all goes well the environmental control measures and use of nasal sprays will decrease the allergic inflammation in her upper airway and hopefully the non-specific reactivity provoked by possible cigarette smoke exposure will decrease.”
A second letter from Dr. Long, dated May 5, 2000, reports on a follow-up visit on that date. This time, the patient reported that “exposure to irritant chemicals such as cigarette smoke and strong odors, fragrances, perfumes, as can be found in shopping malls or waiting rooms provoke a constellation of symptoms.” Dr. Long reiterates his diagnosis of “underlying allergic rhinitis with the likely important aeroallergens being dust mites,” and then observes that “[t]here is a condition known and (sic) vasomotor rhinitis which appears to represent a secondary increased reactivity to nonspecific irritants that often occurs as a consequence of allergic inflammation in the nasal passages. It, therefore, also responds well to treatment of the allergic inflammation.” He again recommends measures to minimize exposure to dust mites, along with the use of nasal steroid sprays. He then observes that “avoidance of exposure to irritants can only be to her benefit. She indicates that she does get second-hand cigarette smoke exposure in her living environment and any measures that could be employed to minimize that exposure are likely to be to her significant benefit.” A third report of Dr. Long, dated October 2, 2001, recites the same history and assessment. In an accompanying affidavit, Dr. Long states “[a]ssuming that second hand smoke is present and the patient is exposed to the same at the time she is suffering from the aforesaid symptoms, it is my opinion based on a reasonable degree of medical probability that the *321 above described symptoms are in part causally related to the presence of second hand smoke.” The plaintiff also offers a letter from a Dr. Lorraine Allegro, dated August 22, 2000, stating that “smoking can exacerbate your medical problems.”
The plaintiffs own description of her condition and its effect on her, as given in her deposition testimony, is as follows: “I can no longer wear perfume and I never will be able to wear perfume. I can no longer have scented candles in my house and I never will be able to do that. I can no longer go into certain places like Building 19. I can ride the T in the winter but if someone gets on and they have a strong smell I have to get off... I can’t be around anybody that smokes.”
DISCUSSION
This Court grants summary judgment where no genuine issue of material fact exists and the record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of establishing the absence of genuine dispute on every material issue. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute of material fact either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The opposing party may not rest on the allegations of the pleadings, nor may it rely on “bare assertions and conclusions regarding [its own] understandings, beliefs, and assumptions.” Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989). Mere contradictions of factual allegations, without evidentiary support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. See Madsen v. Erwin, 395 Mass. 715, 721 (1985), quoting Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3rd Cir. 1972) (noting that conclusoiy statements, denials, and allegations are insufficient to raise material issues of fact). The opposing party’s obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet its burden of proof on the issues raised by the motion.
In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility or find facts. See Dawes, 369 Mass. at 553; Mass.R.Civ.P. 56(c); Colley v. Benson, Young & Downs Insurance Agency, Inc., 42 Mass.App.Ct. 527, 528; see also Kelley v. Rossi, 395 Mass. 659, 663 (1985).
1. Breach of the Covenant of Quiet Enjoyment
General Laws c. 186, §14, imposes liability on “any lessor or landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant.” ‘The covenant of quiet enjoyment protects a tenant’s right to freedom from serious interference with his tenancy — acts or omissions that impair the character and value of the leasehold.” Doe v. New Bedford Housing Authority, 417 Mass. 273, 285 (1994). The interference need not arise from the landlord’s conduct directly; a landlord may incur liability as a result of conduct of third parties, if serious interference with the tenancy is a “natural and probable consequence of what [the landlord] did, what he failed to do, or what he permitted to be done.” Id. at 285 (reversing summary judgment where evidence indicated landlord failed to take reasonable, relatively easy measures to stop on-going drug dealing in common areas that was so pervasive as to prevent tenants’ use of those areas). A landlord’s failure to repair defects in the premises of which the landlord has notice can give rise to liability, if such defects result in a serious interference with the tenancy. See Cruz Mgt. Co. v. Thomas, 417 Mass. 782, 789 (1994). The conduct of the landlord need not be intentional, but it must be at least negligent; the statute does not impose or permit strict liability. See Al-Ziab v. Mourgis, 424 Mass. 847, 850-51 (1997).
The plaintiffs theory on this count, as set forth in her memorandum, is that the Housing Authority interfered with her right to quiet enjoyment of her apartment by failing to act to correct defective conditions that permitted smoke to infiltrate into her apartment.[11] She refers in particular to its failure to “investigate and/or make repairs to the floor, walls or door sweep.” This theory suffers from two fundamental problems. First, the plaintiff has failed to offer evidence that smoke actually did infiltrate her apartment in any significant quantity. Second, even if that hurdle could be cleared, she has failed to offer evidence that any such infiltration resulted from any defect of which the Housing Authority had notice.
The evidence of smoke in the plaintiffs apartment is, in essence, that the plaintiff and others smelled smoke there, and that she experienced symptoms that she attributes to smoke. Notably absent from the record is any evidence that anyone has ever tested the air in the plaintiffs apartment for the presence of *322 cigarette smoke.[12] From the smell, along with her symptoms, she would seek to have a jury infer that smoke itself was present in her apartment. The inference does not follow from the mere smell where, as was indisputably the case here, smoking was occurring nearby. Nor do the plaintiffs symptoms assist her on this point, since her medical reports indicate, and she herself testified, that she suffers symptoms from the mere smell of various substances, including smoke.
Evidence is similarly lacking of the existence of any defect, of which the Housing Authority had notice, resulting in smoke infiltration. The plaintiffs memorandum refers to the floor, walls, and door sweep. As to walls, the record is devoid of any evidence of defect. As to the floor, the only evidence offered is the opinion of health agent Joseph Godzik that smoke “could” enter through separations in sub floor joints. Assuming that the plaintiff were to offer that opinion in some admissible form at trial, “could” would not suffice; to prevail on her claim at trial, she would have to present evidence sufficient to support a finding that smoke did enter the apartment as a result of some defective condition. See McNamara v. Honeyman, 406 Mass. 43, 46 (1989) (‘The inferences to be drawn from the evidence must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture”); see also Meyer v. Wagner, 57 Mass.App.Ct. 494, 501 (2003).
Moreover, the report the plaintiff offers from Covino Environmental Associates refutes Godzik’s suggestion; Covino reported air flow from the downstairs apartment only “through a small crack located underneath the tile floor in a corner of the kitchen,” not through separations in sub-floor joints.[13] The Covino report similarly appears to eliminate any theoiy that smoke entered the apartment from the common hallway as a result of the broken door sweep; Covino tested the lower edge of the front door, and found no air flow into or out of the apartment.
The plaintiff relies on an unpublished decision of the Housing Court in the case of 50-58 Gainsborough Street Realty Trust v. Haile, Summary Process No. 98-02279 (Daher, J., June 8, 1998). There the landlord operated a nightclub on the floor below the tenants’ apartment. The tenants offered evidence that smoke from the nightclub entered the apartment through cracks in the fireplaces and electrical outlets. The Court credited that evidence, and on that basis found a breach of the implied warranty of habitability.
This Court has no doubt that, as the Housing Court held there, a landlord’s conduct causing or permitting substantial quantities of smoke to enter a tenant’s apartment due to a defective condition would be actionable. See Westland Housing Corp. v. Scott, 312 Mass. 375, 378 (1942) (affirming finding of constructive eviction where “smoke, soot, and oil came into the tenant’s apartment through openings around the pipes, in the baseboards, and the floor of the tenant’s apartment... due to a defect in the ‘boiler,’ which the landlord endeavored to remedy without success”). The problem here is that the tenant has failed to offer evidence of the facts that are central to her claim that smoke actually did enter the apartment, and that it did so due to a defective condition. Accordingly, the defendant is entitled to judgment as a matter of law on count I.
2. Breach of Contract
The plaintiff rests her breach of contract claim on the “Management Responsibilities” provisions of her lease, set forth supra. She contends that the Housing Authority’s failure to repair alleged defective conditions of which it had notice violated its responsibilities listed as items A, H, H(4), I and J. In particular, she focuses in her memorandum on failures to repair the floor and the door sweep. Interpretation of the cited lease provisions is a question of law to be decided by the Court. Lexington Insurance Company v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995). The provisions the plaintiff relies on are clear on their face, requiring little interpretation.
Item A requires the landlord to observe the tenant’s statutoiy right to quiet enjoyment. For the reasons discussed in the previous section, no evidence indicates any breach of that right. Item H requires the landlord to maintain the premises in “decent, safe and sanitary condition,” and .to comply with the sanitaiy code and other applicable regulatoiy requirements. The phrase “decent, safe and sanitaiy condition” tracks the language of federal regulations establishing standards for federally funded housing programs. See 24 C.F.R. §5.703 (establishing substantive standards for “decent, safe, sanitaiy” housing), and §881.201 (“Housing is decent, safe, and sanitaiy if it meets the physical condition requirements” in §5.703). See also G.L.c. 121B, §32 (declaring policy of the Commonwealth that “each housing authority shall manage and operate decent, safe and sanitaiy dwelling accommodations at the lowest possible cost”). Accordingly, the Court reads the “decent, safe and sanitaiy” requirement in item H as coextensive with the requirement of compliance with the sanitary code and other regulations, so that regulatoiy compliance constitutes maintenance of the premises in “decent, safe and sanitaiy condition.” No evidence offered here indicates any breach of the sanitaiy code or of any other regulatoiy requirements.
Item H4 requires maintenance of “structural elements” in good repair, weatherproof, and free of cracks and holes. The Court reads this provision, particularly its reference to “structural elements,” as addressing significant defects affecting the integrity or function of essential components of the structure. The evidence offered does not indicate that the failure to repair the floor and door sweep breached this obligation. As to the floor, the only evidence of any defect is Joseph *323 Godzik’s observation of “slight sagging,” and his opinion that such sagging “could” permit air infiltration.[14] As discussed supra, that opinion, even if admitted in evidence, would not prove that it did, nor is “slight sagging” in itself sufficient to establish a breach, without evidence of any impairment of function. As to the broken door sweep, as discussed supra, no evidence indicates that it contributed to any air flow problem, or that it had any other functional effect.
Item I requires the landlord to make “emergency repairs” — that is, repairs to defects the landlord determines to pose an immediate and serious threat to health and safety “forthwith.” No evidence indicates the existence of any defect that the landlord did, or reasonably should have, determined to pose such threat. This provision has no application here.
Item J requires the landlord to “make a good faith effort” to complete non-emergency repairs within thirty days. Here again, the conditions the plaintiff cites are the floor and the door sweep. As to the floor, for the reasons discussed supra, the evidence indicates no need for repair. As to the door sweep, repair appears warranted, but the only evidence offered on the subject is that the Housing Authority offered to repair it, and the plaintiff declined. Such an offer, unless subject to some unreasonable condition, which the record does not indicate, would meet the requirement of good faith effort. Thus, the evidence offered fails to show any breach of contract, and the Housing Authority is entitled to judgment as a matter of law on count II.
3. Negligence
To prevail on a claim of negligence, the plaintiff must prove the elements of duty, breach, causation, and damages. See generally, O’Sullivan v. Shaw, 431 Mass. 20, 203 (2000). “A residential landlord owes a duty to maintain its property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the probable seriousness of such injuries, and the burden of reducing or avoiding the risk.” Roderick v. Brandy Hill Co., 36 Mass.App.Ct. 948, 949 (1994), citing Young v. Garwicki, 380 Mass. 162, 169 (1980).
The plaintiffs claim of negligence, as presented in her memorandum, is essentially the same as her claim of breach of quiet enjoyment, and suffers from the same defects. She contends that the Housing Authority failed to remedy smoke infiltration into her apartment, and that she suffer physical injury as a result. Here again, she fails to offer any evidence of actual infiltration of smoke, and fails to identify any defective condition resulting in smoke infiltration.
The plaintiff devotes considerable attention to the Housing Authority’s failure to perform a prompt and thorough inspection to evaluate her complaints; she levels a series of criticisms at the inspection performed by Randy Waters in January of 2001. A reasonable landlord would certainly be well advised to investigate thoroughly and promptly in response to a complaint of the sort raised by the plaintiff. But a failure to investigate, in and of itself, does not establish the elements of negligence. Inadequate investigation may leave a defect undetected and unremedied, with resulting injury, but a failure to inspect, in and of itself, does not cause injury. The evidence offered here fails to indicate that any defect existed that caused any injury. The defendant is entitled to judgment as a matter of law on count III.
4. Handicap Discrimination
General laws chapter 15IB, §1, defines a handicapped person, at paragraph (19), as “any person who has a handicap.”[15] Handicap, in turn, is defined in §1(17) as “a physical or mental impairment which substantially limits one or more major life activities of a person.” Massachusetts Commission Against Discrimination guidelines elaborate on the phrase “substantially limits,” requiring consideration of whether the condition “prohibits or substantially restricts an individual’s capacity to perform [the activity] as compared to the ability of the average person in the general population to perform the same activity,” based on the nature, severity, duration, and long-term impact of the impairment. Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination On the Basis of Handicap — Chapter 151B, §11 (1998).
The evidence offered here indicates that the plaintiff has “vasomotor rhinitis,” defined by her doctor as “a secondary increased reactivity to nonspecific irritants ... as a consequence of allergic inflammation in the nasal passages.” The consequence of this condition, according to the plaintiffs own testimony, is that “I can no longer wear perfume and I never will be able to wear perfume. I can no longer have scented candles in my house and I never will be able to do that. I can no longer go into certain places like Building 19.1 can ride the T in the winter but if someone gets on and they have a strong smell I have to get off ... I can’t be around anybody that smokes.”
The restrictions the plaintiff described in her testimony fall well short of substantial limitation of any major life activity. The plaintiff argues in her memorandum that her condition limits her ability to sleep, think, and see. Certainly these are major life activities, but the evidence offered does not indicate that the plaintiffs condition substantially limits her ability to engage in them. As to thinking, the record is completely devoid of any evidence of any effect. As to seeing, the only evidence is the doctor’s recitation that the plaintiff reported to him “ocular itching, ocular tiredness, [and] tendency to rub her eyes.” Nothing in any of the medical reports, or in the plaintiffs testimony, suggests any effect on vision, let alone substantial limitation. As to sleeping, the only evidence is the doctor’s recitation that the plaintiff reported to him “nocturnal wakening.” No evidence indicates how *324 often such wakening occurs, or how long it lasts when it does occur. Evidence that the plaintiff wakes at night with some unspecified frequency does not suffice to establish that her condition “substantially limits” her ability to sleep. See Igartua v. City of Newton, 11 Mass. L. Rptr. 188 (Mass.Super. 2000, Gants, J.) (allergic acute sensitivity to smoke insufficient absent medical evidence that that condition substantially limits breathing or working); Ryan v. Springfield Housing Authority, 14 MDLR 1134 (1992) (MCAD concludes complainant’s testimony to irritating effects of cigarette smoke, together with medical diagnosis of chronic sinusitis, insufficient to show substantial limitation of major life activity); compare Bergman v. Town of Burlington School Department, 18 MDLR 143 (1996) (MCAD finds complainant to be handicapped based on medical evidence that her asthma “substantially limits breathing”).
Having failed to offer evidence sufficient to prove that she is a “handicapped person” within the meaning of G.L.c. 151B, the plaintiff cannot meet her burden of proof on her claim of discrimination. Accordingly, the defendant is entitled to judgment as a matter of law on count IV of the complaint.
CONCLUSION AND ORDER
For the reasons stated, the Defendant Cohasset Housing Authority’s Motion for Summary Judgment is ALLOWED.

Despite the Court’s indulgence in permitting repeated efforts, both sides’ submissions pursuant to Superior Court Rule 9A(b)(5) fail to fulfill the requirements of that rule. Under the rule, the moving party’s failure would warrant denial of the motion, while the opposing party’s failure would warrant deeming admitted those facts not properly contested, and disregarding additional facts asserted without reference to supporting evidentiary material. In the exercise of discretion-, and in order to address the case on its merits and avoid further delay, the Court has not adopted either course, but has examined all evidentiary materials submitted and attempted to glean the pertinent facts from the admissible evidence offered. For the same reasons, the Court has considered new materials submitted subsequent to oral argument, despite objections from both sides, and has also considered documents submitted by both sides without proper authentication, but without any apparent dispute as to authenticity. Neither side having moved to strike, the Court has also considered documents submitted by both sides, in the nature of expert reports, despite the absence of affidavits and of any information as to the qualifications of the purported experts.

The timing of these proposals, and of the plaintiffs responses to them, is less than clear in the record.

The record does not indicate precisely what was meant by sealing the floor.

The record does not describe or define a “door sweep." Counsel’s description at argument identifies it as a device attached to the outside of an exterior door, near and parallel to its bottom, extending the door surface to the level of the floor outside the threshold, so as to keep out drafts.

The same interrogatory answer, dated June 24, 2002, goes on to state that, “As a nonsmoker currently resides downstairs, the issue is moot.” This statement is the only information in the evidentiary record regarding occupancy of the downstairs apartment after the filing of the complaint. The parties’ memoranda contain conflicting assertions as to the present occupancy of the downstairs apartment, but neither refers to any evidence on the subject.

Ihe record does not indicate Mr. Godzik’s background or qualifications, beyond the letters “V.M.D.” appearing after his name.

The record provides no further information about his background or qualifications. The Court infers that the Bureau of Housing Construction is within the Department of Communities and Development, the state agency that funds, oversees and regulates Housing Authorities.

Two of these affiants, Roger Lincoln and Susan Cronin, date the visits to 1998, before Nardo’s occupancy of the downstairs apartment. The other two affiants, Judith Croker and Karen Ford, date their visits to “the last two years.” Lincoln’s affidavit notes a “lack of haze in the apartment.”

This unsworn document, like other materials submitted by both sides, provides no information about the background or qualifications of the personnel involved. Indeed, it does not even identify the individual (s) who performed the testing. The date of the testing was after argument on the present motion.

The plaintiff also relies on her Verified Complaint. That document includes certain statements that appear susceptible of personal knowledge on the part of the plaintiff, but others that do not. The Court has considered the former, but disregarded the latter. Thus, the Court considers as admissible evidence the plaintiffs sworn statement that the door sweep is broken, but not her conclusion that smoke infiltrated her apartment from the apartment below due to defects.

The plaintiff does not argue that a breach of quiet enjoyment arose from the alleged impairment of her use of her deck, or from any impairment of her use of common areas. Compare Ianello v. Court Management Corp., 400 Mass. 321, 323 (1987) (breach of quiet enjoyment based on landlord’s conduct in locking tenant out of conference room previously available for use as exercise room). Nor does the plaintiff argue that the mere smell of smoke effected a serious impairment of her tenancy. Compare Manzaro v. McCann, 401 Mass. 880, 885 (1988) (breach found based on smoke alarm left ringing for more than one day).

The plaintiff suggests that the defendant had a duty to conduct such testing, but identifies no source of any such duty. The plaintiff would have the burden to prove the elements of her claim at trial, and must demonstrate her ability to do so to avoid summary judgment.

As noted supra, no evidence indicates notice to the Housing Authority of the “small crack” described by Covino, or of the gap at the top edge of the front door, through which Covino found air flow from the adjacent corridor.

As noted supra, no evidence indicates any notice to the Housing Authority of the “small crack” in the kitchen floor or the gap at the top of the door observed by Covino. Nor does the plaintiff make any argument based on these conditions, presumably because she learned of them only after argument on this motion.

Although the complaint alleges discrimination in violation of a list of state and federal statutes in addition to c. 15 IB, the plaintiffs memorandum addresses the discrimination claim only pursuant to c. 15 IB. The plaintiff thus appears to have waived any claim under any of the other statutes listed, insofar as those statutes might set different standards. Neither side has raised any issue of whether the plaintiff complied with the administrative requirements of c. 151B; accordingly, the Court does not address any such issue.