Wexler, James H., J.

INTRODUCTION

This is a medical malpractice action seeking recovery against physicians Jennifer Goedken, M.D. (“Dr. Goedken”), Jacqueline Murrell, M.D. (“Dr. Murrell”), Karen W. Green, M.D. (“Dr. Green”), MarianneFleischman, M.D. (“Dr. Fleischman”), Jennifer Jill Daman, M.D. (“Dr. Daman”), and against the Commonwealth of Massachusetts for injuries allegedly suffered by the minor plaintiff, Denzel Mensah. All physicians filed Motions for Summary Judgment asserting that as residents and staff members of the University of Massachusetts Medical School (“the Medical School”), they were “public employees” of the Commonwealth and therefore immune from liability pursuant to the Massachusetts Tort Claims Act (“the Act”). Plaintiffs maintain that there are disputed issues of material fact precluding the doctors from immunity under the Act. For the following reasons, the defendants’ motions are DENIED.

BACKGROUND

The Medical Center
The University of Massachusetts (“The University”) operates the Medical School and related professional schools for nurses and other healthcare professionals. Prior to April 1998, in conjunction with the Medical School, the University operated the University of Massachusetts Medical Center (UMMC), a faculty Group Practice Plan, and Self-Insurance Trust. Collectively these were known as the “UMass Clinical Division.” The UMass Clinical Division, the Worcester City Campus Corporation (“WCCC”), and the health providers and organizations controlled by WCCC were collectively known as the “UMass Clinical System.”
On April 1, 1998, the UMass Clinical System merged with Memorial Health Care, Inc., a private nonprofit corporation and the parent corporation of Memorial Hospital, Inc. (“Memorial”). The merger resulted in the creation of two new private, nonprofit corporations, UMass Memorial Health Care, Inc. (“UMass Memorial”) and UMass Memorial Medical Center, Inc. (“The Medical Center"). The Medical Center was established to operate the consolidated activities of UMMC and Memorial Hospital. UMass Memorial was established to oversee and control the consolidated activities and operations of the UMass Clinical System and Memorial. The Medical Center consists of three hospitals, all located in Worcester: the “University Campus” located at 55 Lake Avenue North; the “Memorial Campus” located at 119 Belmont Street; and the “Hahnemann Campus” located at 281 Lincoln Street.
Prior to the merger, the University, UMass Memorial, and the Medical Center executed an Academic Affiliation and Support Agreement (“the Affiliation Agreement”) which made the Medical School the exclusive academic and clinical teaching affiliate of the Medical Center. The Affiliation Agreement was intended in part to ensure that University residents would continue to have access to clinical training sites and research opportunities and programs following the merger.
The Affiliation Agreement provided that the University was to control decisions regarding academic issues and medical education and training for its residents, including rotation and work assignments. The University, through department chairs of the Medical School, was responsible for the supervision, direction, and control of all residents assigned to the Medical Center. The agreement also provided that only medical staff members at the Medical Center and affiliated University hospitals with Medical School faculty appointments were allowed to participate in the training of medical residents.
As part of the University residency training program, residents were assigned to specific rotations at the Medical Center. The Graduate Medical Education (“GME”) Agreement executed in conjunction with the merger specifically provided that resident physiciáns would remain employees of the University and would not, at any time, be considered agents or employees of the Medical Center. Moreover, the GME Agreement required the University to establish and implement personnel and institutional policies which applied to all residents assigned to the Medical Center. The University required all Medical Center resident evaluations to be completed within specified time periods on University forms. The University established an annual stipend to be paid to its residents, which included those assigned to the Medical Center. Finally, the Commonwealth directly assessed costs towards the University for resident employee benefits, including health and life insurance, dental insurance, retirement, workers’ compensation and unemployment insurance.

Plaintiffs’ Care

Plaintiff, Vida Amankwaa (“Ms. Amankwaa”), received her prenatal care from the Medical Center. Her initial estimated deliveiy date was calculated to be *8 June 20, 1998. An obstetrical ultrasound performed on January 26, 1998 indicated the fetal size of the baby disagreed with the anticipated delivery date by three weeks. Therefore, the delivery date was changed to July 14, 1998.
A subsequent ultrasound performed on March 2, 1998 suggested fetal growth was normal. Ms. Amankwaa was serum screened for Down Syndrome and Neural Tube Defects on January 21, 1998 at what was initially felt to be 18 weeks 6 days gestation. At that time her risk of Down Syndrome was noted to be 1 in 35. The gestational age of the baby was resubmitted as 15 weeks 2 days, and her risk for Down Syndrome was as recalculated to be 1 in 1500. On March 24, 1998, at 24 weeks gestation, the baby’s size by examination was noted to be larger than what the dates would normally indicate with fundal height being 28 centimeters. In addition, a colposcopy was ordered since Ms. Amankwaa was noted to have had two pap smears with atypical cells of undetermined significance. By April 7, 1998, at 26 weeks gestation, fundal height was 30 centimeters, and maternal weight was 212.5 pounds. A one-hour glucola test was also performed that day and was noted' to be 124 (70-119). Ms. Amankwaa’s urine was negative for trace glucose and protein throughout the pregnancy. No further testing was performed.
An obstetrical ultrasound performed on April 14, 1998 indicated the baby was in the 65th percentile for weight and that fetal growth was normal, however, the baby presented breech. The plan was to monitor the baby’s presentation for possible version. During Ms. Amankwaa’s prenatal visit on April 28, 1998, at 29 weeks gestation, the fundal height was 33 centimeters and maternal weight was 220 pounds. By May 19, 1998, at 32 weeks gestation, the fundal height was 35 centimeters and progress notes for this visit indicated that the baby’s size continued to be larger than on prior prenatal visits. By June 26, 1998, after a series of two other visits to the Medical Center in between, the baby’s fundal height was 41 centimeters and maternal weight was 235 pounds. At the last prenatal visit on July 2, 1998, at 38 weeks gestation, fundal height was 45 centimeters and Ms. Amankwaa was noted to have gained 10 pounds in two weeks. On July 9, 1998 at approximately 6:00 a.m., Ms. Amankwaa presented to Memorial Hospital at 39 weeks gestation having leaked clear fluid since 5:00 a.m. She began contractions shortly after her arrival and her cervix was found to be 1 centimeter dilated and 80% effaced. She was started on Pitocin and her urine was noted to be 3+ for protein. The' admitting record noted the histories of increasing fundal height and maternal weight gain of 10 pounds over two weeks. The admitting physician was Dr. Murrell.
Ms. Amankwaa continued to receive Pitocin over the next several hours and the fetal heart tracing remained reassuring in the range of 120-140. At 10:50 a.m., a note was made in her chart by Dr. Fleischman that documented the maternal history of the 10-pound weight gain. The records further showed that ongoing assessment notes were made by Drs. Fleischman and Daman, residents at the Medical Center. At approximately 12:56 a.m. on July 10, 1998, Ms. Amankwaa was experiencing rectal pressure and had an anterior cervical lip. At some point thereafter, she began to push. The chart’s notes indicate that after 35 minutes of pushing, the vertex was delivered to the chin by resident Drs. Fleischman and Daman. However, the baby’s anterior shoulder did not deliver with normal maneuvers performed by these doctors. Immediately thereafter, as noted on the delivery note, Drs. Fleischman and Daman called Dr. Delpapa to assist in the delivery. Dr. Delpapa attempted to corkscrew the shoulders which was unsuccessful. After extending the episiotomy, Dr. Delpapa was able to deliver the posterior shoulder followed by the anterior shoulder. The baby’s cord blood ph was noted to be 7.15 and the baby, plaintiff Denzel Mensah (“Denzel” or “baby”) had little spontaneous movement of his right arm. Denzel birth weight was recorded as 10 pounds, 6.2 ounces and he was 23 inches long. Neonatology was called to the birthing room after Denzel’s birth, he was noted to have a right Erb’s palsy secondary to shoulder dystocia.
Plaintiff, Godwill Mensah (“Mr. Mensah”), Denzel’s father was present in the delivery room when his son was bom. Mr. Mensah alleges that during the delivery, Drs. Fleishman and Daman were pulling on his son’s head in an attempt to deliver him. Newborn records indicate that Denzel had no movement of his right shoulder or elbow. Denzel has since been examined by several neurologists who have determined that he has continuing right arm problems associated with the brachioplexus injury which allegedly occurred during his delivery.

The Doctors

There are five physicians named in this action. There is no factual dispute that at some point, each of the doctors had contact with Ms. Amankwaa and were in some way involved in her prenatal care and/or the labor and delivery of her son. Specifically, Drs. Murrell, Daman, Fleischman, and Goedken were employed as residents of the Medical School’s Obstetrics-Gynecology (“OB-GYN”) Residency Program at the time they treated Ms. Amankwaa. Moreover, during the two occasions she saw and treated Ms. Amankwaa in April and July 1998, Dr. Green was employed by the Medical School as a Professor of Obstetrics and Gynecology, and a staff physician in the OB-GYN Department at the Medical Center.
On July 9, 1998, when Ms. Amankwaa first presented at the hospital, Dr. Green was the attending physician. She saw plaintiff at approximately 2:49 p.m. and determined that Ms. Amankwaa was at term but not in labor. Dr. Green therefore gave Ms. *9 Amankwaa Pitocin, a medication to assist in the augmentation of labor. Dr. Green went off duty at 5:00 p.m., that same day, gave her report about plaintiff to Dr. Delpapa, who then took over for Dr. Green. Dr. Green did not participate in the delivery of Denzel. Plaintiffs allege that Dr. Green’s failure to order an ultrasound upon Ms. Amankwaa’s presentment and the admitting physician’s (i.e., Dr. Murrell) notes violated the acceptable standard of medical care. Moreover, plaintiffs contend that Dr. Green’s responsibilities as the overall attending physician at the time greatly exceeded those of the residents she was responsible for supervising, and her reliance on a resident to make final determinations of a patient’s care was per se negligent.
Dr. Murrell was the admitting physician when Ms. Amankwaa presented at the hospital on July 9, 1998. Upon presentment, Dr. Murrell documented that Ms. Amankwaa had gained 10 pounds in the past two weeks. Plaintiffs allege her failure to order an ultrasound to gauge the current weight of the baby violated the acceptable standard of medical care.
Plaintiffs allege Dr. Goedken violated the acceptable standard of medical care in her prenatal treatment of Ms. Amankwaa at various stages of her pregnancy. Specifically, plaintiffs claim that Dr. Goedken did not appropriately diagnose the size or weight of the baby during prenatal visits despite reliance on ultrasound and other medical tests. Dr. Goedken was not present for the labor and delivery of Denzel.
Drs. Fleischman and Daman were on rotation at the hospital when Ms. Amankwaa presented on July 9, 1998. Both doctors were present in the delivery room when Ms. Amankwaa was in labor. Plaintiffs allege that in each of the doctors’ attempts to deliver the baby, they each pulled on his head to no avail before seeking the help of Dr. Delpapa, the then attending physician. Moreover, Drs. Fleischman and Daman were allegedly negligent in failing to order a final ultrasound to determine the baby’s actual weight and size thereby giving Ms. Amankwaa an opportunity for a cesarean delivery.
Defendant physicians assert that they are precluded from liability in this case because they were employed by the University’s Medical School as “public employees” pursuant to the Massachusetts Tort Claims Act, and they are therefore entitled to summary judgment. Plaintiffs counter that genuine issues of material fact exist against all defendant doctors for such a finding, and therefore, summary judgment should not be granted.

DISCUSSION

Summary Judgment Standard

Summary judgment shall be granted where there are no genuine issues of material fact .and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r. of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp. 410 Mass. 706, 716 (1991).
The non-moving party cannot conjure up genuine issues of material fact or merely rely on the allegations or denials of her pleading. See Mass.R.Civ.P. 56(e). Conclusoiy statements, general denials, and allegations not based on personal knowledge are insufficient to avoid summary judgment. Madsen v. Erwin, 395 Mass. 715, 721 (1985). Rather, the non-moving party bears the burden of introducing enough countervailing data to demonstrate the existence of a genuine issue for trial. See Wooster v. Abdow Corp., 46 Mass.App.Ct. 665, 673 (1999).

Massachusetts Tort Claims Act

The Massachusetts Tort Claims Act (The Act) renders public employees immune from liability by stating, in relevant part, that:
Public employers shall be liable for the injury or loss of property or personal injury- or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his employment.
G.L.c. 258, §2. A “public employee” is defined as “the Commonwealth and any county, city, town, educational collaborative or district... and any department, office commission, committee, council, board, division, bureau, institution, agency or authority thereof which exercises direction and control over the public employee.” Id. at §1. A “public employee” is defined, inter alia, as anyone “elected or appointed, officers or employees of any public employer, whether serving full or part-time, temporary or permanent, compensated or uncompensated.” Id. (emphasis added). Although the Act “provides rio detailed guidance in deciding whether a person is a ‘public employee’. . . [t)he right to control an agent’s activities has been the guiding principle in deciding cases involving an assertion of vicarious liability against the agent’s principal.” Kelley v. Rossi, 395 Mass. 659, 661 (1985). Finally, whether an individual is a public employee is a question of fact. Rowe v. Arlington, 28 Mass.App.Ct. 389, 391 (1990).
Massachusetts courts have established that the University of Massachusetts, including the University’s Medical Center, is a public employer within the meaning of G.L.c. 258, §2. See McNamara *10 v. Honeyman, 406 Mass. 43, 47 (1989); Hannigarin v. New Gamma-Delta Chapter of Kappa Sigma Fraternity, 367 Mass. 658, 659 (1975); Robinson v. Commonwealth, 32 Mass.App.Ct. 6, 9 (1992). Despite not being subject to the Department of Education’s control within the Commonwealth “(t)here is no question that the University of Massachusetts functions as a State educational institution... [whose] employees are considered State employees.” Robinson, 32 Mass.App.Ct. at 9.
The dispositive issue in determining whether an individual is a “public employee” under the Act requires a finding that the person, while acting within the scope of his employment, was subject to the direction and control of the public employer." Smith v. Steinberg, 395 Mass. 666, 667 (1985). For physicians, Massachusetts courts examine whether the public employer directs and controls the physician’s treatment of the patient. See Williams v. Hartman, 413 Mass. 398, 400 (1992); Kelley, 395 Mass. at 661. However, “[a] physician is not necessarily a public employee simply because a public entity pays his or her salary, provides a retirement fund, or manages a vacation schedule.”' Hartman, 413 Mass. at 400. See also McNamara, 406 Mass. at 48 (noting that although the University of Massachusetts is a public employer, there is no automatic presumption that all University employees are public employees; instead, it is necessary to examine the circumstances surrounding the doctor’s specific treatment of the patient). Instead, “the very nature of a physician’s function tends to suggest that in most instances [the physician] will act as an independent contractor,” not a public employee, because “the profession is distinct and requires a high level of skill and training; and the physician must use independent judgment.” Kelley, 395 Mass. at 662.
Massachusetts courts consider the following factors in determining whether a resident was a public employee acting within the scope of his employment while treating a patient: (1) whether the public employer assigns the residents duties; (2) whether the public employer regulates the residents work schedule; (3) whether the public employer controls which patients the resident treats; (4) whether the public employer had assigned the resident to the particular department where the care and treatment at issue was provided; (5) whether the public employer has the authority to dismiss the resident from the residency program; (6) whether the resident is required to follow the regulations and policies of the public employer in the course of his residency; (7) whether the resident has admitting privileges to the hospital; (8) whether the resident was authorized to discharge a patient without the consent of the supervising attending physician; and (9) whether the public employer paid the resident a salary, health benefits, and life insurance benefits. See Kelley, 395 Mass. at 664; Smith, 395 Mass. at 669; McNamara, 406 Mass. at 46; Williams v. Bresnahan, 27 Mass.App.Ct. 191, 193 (1989). These factors are examined in their totality, none of which are dispositive of the other. Kelley, 395 Mass. at 664-65; Hartman, 413 Mass. at 400-01.
Here, the court finds material facts exist to preclude summary judgment. Specifically, the circumstances surrounding all doctors’ treatment of Ms. Amankwaa at the time the alleged negligence occurred are unclear. For example, the amount of independent discretion each physician had in: (1) treating Ms. Amankwaa while in the delivery room; (2) seeking the assistance of the attending physicians, Drs. Green and Delpapa, throughout the time Ms. Amankwaa was in the hospital; and (3) generally, how closely and consistently each resident worked with Drs. Green and Delpapa in the OB-GYN Department are all issues dispositive of whether each doctor was truly a “public employee” immune from liability. The level of supervision and control the attending physicians, Drs. Green and Delpapa actually exercised over resident Drs. Fleischman, Daman, Murrell, and Goedken in the treatment of Ms. Amankwaa and delivery of her son, Denzel, cannot be determined from the record. For instance, there is evidence supporting plaintiffs’ claims that at certain moments when the alleged negligence occurred, each respective doctor used her own independent judgment. Specifically, Drs. Fleischman and Daman are alleged to have pulled on the baby’s head during delivery. However, the means and manner used in conducting such a tactic may have been acceptable practice in the hospital and through the OB-GYN Residency Program. On the other hand, there is also evidence that the residents were supervised and controlled by the hospital at all times. This included the presence of both Drs. Green and Delpapa when Ms. Amankwaa presented at the hospital and during her subsequent delivery although the amount of supervision each gave is unclear.
Moreover, considering so many physicians were involved in Ms. Amankwaa’s labor and delivery, each particular actor in the chain of events could have exacerbated the alleged injuries to her and her son. Such consideration presents questions of fact implicating direct causation as a basis for the negligence claims. Summary judgment is therefore inappropriate here.
Further, the status of the Medical Center where the physicians carried out their duties in caring for the plaintiffs is not definite, especially in light of the merger between Memorial Health Care, Inc., its parent corporation, Memorial Hospital, Inc., and the UMass Clinical System. Defendants concede that the resulting entities of the merger created “two new private non-profit corporations” on the face of the merger agreement itself. Although the Medical School was to remain a public entity and keep its status as a “public *11 employee” pursuant to the Affiliation Agreement post-merger, this does not automatically entitle the physicians to a finding of “public employee” status in treating Ms. Amankwaa and Denzel without more. See McNamara, 406 Mass. at 48. Rather, the circumstances surrounding her care at the time the alleged negligence occurred is the appropriate analysis to determine whether each doctor was a “public employee” immune from liability. The court notes, however, that the merger may have affected the relationship between the hospital and its attending physicians and their responsibility to supervise and control residents. Thus, the merger’s practical effect creates a genuine issue of material fact that should be left for a jury.

ORDER

For the reasons stated herein, it is hereby ordered that defendants’ Motions for Summary Judgment pursuant to Mass.R.Civ.P. 56 are DENIED.