Billings, Thomas R, J.

INTRODUCTION

This action poses, as have others before it, issues concerning agency relationships of medical personnel practicing in the Universiiy of Massachusetts medical system. Explored here are the relationships among medical residents in the University of Massachusetts graduate medical education program, the University (a public employer), and UMass Memorial Medical Center (a private nonprofit corporation; herein, the “Medical Center”). The residents assert that they are public employees and thus are immune from suit under G.L.c. 258, §2. The Medical Center agrees that the residents are employees of the University and says that, ipso facto, it (the Medical Center) cannot be vicariously liable for the residents’ actions or omissions.
For the reasons that follow, both motions are DENIED.[1]

FACTS

The record discloses the following facts which are either undisputed, or taken here in the light most favorable to the plaintiff.

*628
A. Facts Concerning the Medical Treatment of the Plaintiff’s Decedent

The case arises out of the death of Betty Caranci which, her Executor alleges, resulted from negligent medical care she received at the Medical Center. Prior to her admission, Mrs. Caranci had been diagnosed with an abdominal cancer for which she was receiving radiation, surgery having been deferred due to a recent stroke. She had not eaten or taken liquids consistently, was lethargic, and had recently lost weight. Concerned about her failure to thrive, Dr. Robert Quinlan (the surgeon to whom Mrs. Caranci had been referred for her cancer treatment) admitted her to the Medical Center on September 20, 1999 for nutrition via tube and/or TPN,[2] and for possible surgical resection of the tumor.
After admitting her to the Medical Center, Dr. Quinlan made the decision to place Mrs. Caranci on TPN using a triple lumen catheter. Dr. Pilarisetty (then in his first year of surgical residency) wrote up the order and made the first attempt to place the catheter in the right internal jugular vein; this was discontinued when a relatively high blood pressure suggested that he might have entered the carotid artery instead of the sought-for vein. Dr. Fang (a third-year surgical resident) tried next, in the right subclavian vein, but could not confirm proper placement by x-ray so he discontinued the line. Next, he tried the left side. He was still unsure of his placement so he summoned Dr. Baggs (the chief resident at the time).
Dr. Baggs ascertained that Dr. Fang was able to aspirate venous blood through the line. He ordered a chest x-ray (apparently to ensure that the line was properly placed), and subsequently reviewed the films. The films looked “a little unusual,”[3] but Dr. Baggs attributed this to changes in Mrs. Caranci’s anatomy caused by her radiation treatments. From the aspiration of venous blood, he concluded that the line was properly placed.
The team of residents discussed the situation and decided that Mrs. Caranci’s TPN should be started through the left-sided catheter. At 6:20 a.m. on September 22, Dr. Pilarisetty wrote the order; he repeated it at 10:00 a.m. TPN was administered thereafter, perhaps at 1:40 p.m.
Shortly after this, Mrs. Caranci complained of shortness of breath and fullness in the epigastric area, and her pulse oximetry dropped to 77% on room air. The nursing staff called to report this, and Drs. Baggs and Mahan (a first-year surgical resident) saw Mrs. Caranci. Dr. Mahan ordered various studies. One of these — a chest x-ray — revealed movement of the central line and “marked increase in the left sided pleural effusion.” A CT scan the same day found “a very large left pleural effusion and a moderate sized pericardial effusion.”
Mrs. Caranci’s condition deteriorated rapidly thereafter. The House Officer, Dr. McDade (a second-year surgical resident) was notified in the evening by Mrs. Caranci’s nurses that she was short of breath, but she was not seen by a doctor until 9:30 p.m. An hour later she was transferred to the Intensive Care Unit, where Drs. Baggs and McDade continued to treat her. (Dr. Quinlan did not come to the hospital until the following morning.)
At midnight, a code blue was called. Mrs. Caranci was intubated. Dr. Baggs placed a left central line, through which he aspirated 3 1/2 liters of pink, creamy fluid. The plaintiff maintains — with proper expert support in the Offers of Proof — that this was TPN fluid that had entered the pleural space through an improperly placed intravenous line.
Mrs. Caranci was successfully resuscitated; more fluid was aspirated; and she appeared to improve. She could never be weaned from the respirator, however. On November 5 she was transferred to Fairlawn Rehabilitation Hospital for ventilator management and continued terminal care. On November 12, she was found to be minimally responsive. With the family’s consent she was taken off the ventilator on November 15, and died two days later.

B. The University, The Medical Center, and the Contract Documents

All of the treatment in question occurred after the April 1, 1998 merger of the UMass Clinical System and Memorial Health Care, Inc., which was the parent corporation of Memonal Hospital, Inc. That merger resulted in the creation of two new private, nonprofit corporations, UMass Memorial Health Care, Inc. (“UMass Memorial”) and UMass Memorial Medical Center, Inc. (the “Medical Center”). The Medical Center operates the consolidated activities of UMMC and Memorial Hospital. UMass Memorial oversees and controls the consolidated activities and operations of the UMass Clinical System and Memorial. The Medical Center consists of three hospitals, all located in Worcester: the “University Campus,” the “Memorial Campus,” and the “Hahnemann Campus.”
Just prior to the merger, the University, UMass Memorial, and the Medical Center executed an Academic Affiliation and Support Agreement (the “Affiliation Agreement”). This made the University’s Medical School the exclusive academic and clinical teaching affiliate of the Medical Center, whose hospitals were to be the primary teaching hospitals and clinical training program affiliates for the Medical School. The University and the Medical Center additionally executed a Graduate Medical Education Agreement (the “Education Agreement”), which allocated responsibilities between them for graduate medical education programs sponsored by the University.
Both the Affiliation Agreement and the Education Agreement contain provisions that address, directly and indirectly, the supervision, direction, control, and compensation of residents practicing at the Medical *629 Center. Relevant provisions in the Affiliation Agreement include the following.
Section 2.2.1 provides, in pertinent part:
The Medical School department chairs are responsible for the supervision, direction, and control of residents assigned to the Hospitals [operated by the Medical Center]. Each resident who receives a stipend through the Medical School or the Medical Center, and/or is appointed to a Medical School integrated residency-program is subject to the Medical School Residency Program Personnel Policies. On matters of patient care and professional conduct, residents must also abide by the policies, rules and regulations of the Medical Center and the Hospitals and other Hospital Affiliates at which they are assigned. (Emphasis supplied.)
Section 2.2.2 provides:
All patients seen or treated at the Hospitals or any of the other Hospitals that are Academic Affiliates (together, the “Hospital Affiliates”) or in connection with any of their programs shall, at all times, be under the supervision and responsibility of an attending physician privileged by the respective hospital. The Hospital Affiliates shall not admit patients whose care and treatment will be provided solely by students or residents.
Section 2.2.5 provides, in pertinent part:
The department chair/division directors of the respective departments and services shall be primarily responsible for assurance and documentation of the quality of the teaching programs for medical students assigned to the Academic Affiliates. Only medical staff members at the Hospital Affiliates with Medical School faculty appointments shall participate in the training of medical residents.
Section 3.2.1 and its subsections provide that the Medical Center’s medical staff is to consist of physicians employed by physicians employed by the University and contracted to the Medical Center, physicians employed by UMass Memorial Physicians, Inc. or UMass Memorial Medical Group, Inc., and private physicians. All members of the Medical Center’s medical staff are to have and maintain academic appointments at the Medical School, with the exception of pre-merger Memorial Hospital medical staff who did not hold such appointments. The two institutions’ organizational structures are to mirror one another, with the academic department chairs and division directors of the Academic System (defined to include the University’s graduate schools of medicine, nursing and biomedical sciences, “and various research enterprises”) holding the corresponding positions in the Medical Center’s clinical departments.
Section 3.3 provides that the Medical Center will supply the University with the services of certain individuals “for teaching, research, and other purposes,” while “(t]he University will supply the Medical Center with the services of certain individuals for clinical purposes.” These two groups are referred to as “Cross Funded Employees.”
In the Education Agreement are found the following provisions:
Under Part I.C, [t]he Medical Center shall pay the University for services provided by the Residents pursuant to Section 3.3 of the Affiliation Agreement [i.e., the provision relating to “Cross Funded Employees”) and pursuant to the Medical Educational Services Agreement, provided there shall be no duplication of recovery.
Part II places on “[t]he University, as the sponsoring institution of affiliated graduate medical education programs, . . . final responsibility for all administrative and educational aspects of its sponsored residency and fellowship programs.” Then, in sub-part A:
The University shall recruit, select, appoint, promote and employ physicians to University graduate medical education programs; and shall assign certain of these residents to the Medical Center for education and service purposes.
Residents are acting as and shall remain employees of the University and shall not, at any time, be considered agents or employees of the Medical Center or its hospitals while performing services under this Agreement. Under no circumstances shall this Agreement be considered a contract of partnership or joint venture between the University and the Medical Center. (Emphasis supplied.)
Subparts B and C of Part II provide that the University is to ensure that residents are properly qualified, licensed, and insured against liability, and “shall establish and implement personnel and institutional policies, which shall apply to all Residents appointed by the University, including Residents when assigned to the Medical Center.”
Part II.D provides that the University shall appoint a Program Director for each specially residency program. The Program Director is to have “direct and overall responsibility and authority for the program,” with responsibility for providing written educational goals and program design, recruiting residents, applying personnel and institutional policies, supervising teaching staff both at the University and at the Medical Center, and “supervision and evaluation of residents.”
(Emphasis supplied.)
Part II.E requires the University to “establish the faculty supervision, work hour and work environment standards for the Residents,” and provides *630 that “[t]he University, through appropriate Department Chairs or their designees, shall retain ultimate responsibility for the Residents.”
(Emphasis supplied.)
On the other hand, Part II also provides that the Medical Center is to “provid[e] qualified teaching, supervision, administration and other necessary components of an accredited training program.” (Emphasis supplied.) It is to “provide to the Residents appropriate opportunities for supervised clinical training and classroom instruction toward meeting established program educational goals.” (Part II.F.) Also:
The Medical Center shall, for patient care and related purposes, provide immediate, direct supervision of the Residents. Residents shall report to the division directors, or their designees, of the division to which the Residents are assigned at the Medical Center. Residents, when providing services in the Medical Center, shall abide by all applicable hospital policies, rules, by-laws, regulations and procedures.
The Medical Center shall designate a residency program director for each program included in the Agreement. (Part II.G; emphasis supplied.)
Finally, the Medical Center is to ensure that each division director or designee of the relevant Medical Center division completes required evaluations of residents on a form provided by the University.
In short: while the contract documents explicitly provide that residents are to be employees of the University and not of the Medical Center, they make both of these institutions responsible for supervising the residents. In the Medical Center’s case, this means supervision specifically “for patient care and related purposes.”
The record (again, resolving any genuine factual disputes in the plaintiffs favor) also discloses that the University established and paid the annual stipend paid to its residents (including the resident defendants), and was assessed by the Commonwealth the cost of their employee benefits (health, life, and dental insurance: contributory retirement plan; workers’ compensation and unemployment insurance). Residents’ salaries were in a fixed amount, and did not depend on the number of hours worked or the number of patients treated.
Dr. Robert C. Harland, the director of the Universiiy’s Surgical Residency Program and an attending physician at the Medical Center’s Department of Surgery, supervised, directed and controlled the administrative aspects of each resident defendant’s involvement in the program. Each had to obtain his approval of vacation and personal leave. He designed the educational curriculum of each surgical resident and scheduled educational conferences at the Medical School which all surgical residents were required to attend. He did regular performance evaluations for all surgical residents, and could discharge a resident for cause.
It was Dr. Harland who assigned each of the resident defendants to work at the Medical Center. He had final authority over their work schedules, hours, rotations and assignments. Residents were not permitted to admit patients to the Medical Center, but rather cared for patients admitted by attending physicians (members of the Medical Center’s medical staff). Each resident was required to see those patients in the Medical Center’s surgical service who presented during the hours Dr. Harland had assigned the resident to work. This is how each came to have contact with Mrs. Caranci: she was a private patient of Dr. Robert M. Quinlan, a surgeon with admitting privileges at the Medical Center.
Residents at the Medical Center were required to follow the Medical Center’s regulations relating to patient care. Generally speaking, their role was to execute the details of a patient care plan formulated by the attending physician. Typically, a team of residents would see patients by making rounds in their assigned departments, unaccompanied by attending physicians. The team would plan the patient’s care for the day. Residents had the authoriiy to conduct physical examinations; to order tests, medications, and x-rays; to administer medications; and to provide orders to the nursing staff.[4] They would perform procedures as ready (typically after observing a more senior resident or other physician perform the procedure a few times).
In this case, for example, Dr. Quinlan determined that Mrs. Caranci needed TPN, and ordered it. Dr. Pillarisetty wrote up the order, and the residents caring for Mrs. Caranci attempted to implement it. Neither Dr. Quinlan, nor any other attending, directly monitored or supervised such details as the placement of the catheter, or the order to start the TPN once the catheter was installed; these were left to the resident team (with juniors calling on their seniors as necessary).

DISCUSSION

A. The Residents' Motion

Section 2 of the Massachusetts Tort Claims Act, G.L.c. 258, §2, provides for liability of “public employers,” up to $100,000, for injuries
caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances.
The same section further provides;
The remedies provided by this chapter shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the public employer or, the public employee or his estate whose negligent or wrongful act or omission gave rise to such claim, and no such public em *631 ployee or the estate of such public employee shall be liable for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment
Section 1 defines a “public employer” as any of a defined class of public entities “which exercises direction and control over the public employee.” The same test governs a person’s status as a “public employee,” and has been characterized as but the application of the same “legal principles ... as those that have determined whether an agent is a servant for whose negligent acts a principal may be liable under the common law doctrine of respondeat superior." Kelley v. Rossi, 395 Mass. 659, 661 (1985); compare Clickner v. Lowell, 422 Mass. 539, 542 (1996) (applying the same principles to the public employer’s vicarious liability).
The continued validity of this last assertion has become less clear — to this reader at least — over time. Historically, the rule was that for respondeat superior to apply, “the employee must be subject to control by the employer, not only as to the result to be accomplished but also as to the means to be used.” Khoury v. Edison Elec. Illuminating Co., 265 Mass. 236, 238 (1928). In Konick v. Berke, Moore Co., 355 Mass. 463, 467 (1969)—a case which, like Khoury, involved a motor vehicle accident — the court held that “if there is a right to control the employee’s general activities, he is a servant, even though the master may not have the right to control the details of the operation of the car when the servant is carrying out an errand for his master.” This was the state of the law when the SJC decided Kelley v. Rossi,
More recently, in Dias v. Brigham Medical Assocs., Inc., 438 Mass. 317 (2002), the SJC provided welcome clarification on the issue of the respondeat superior liability of a group medical practice for a member physician’s negligence. Once it is proven that the physician is an employee of the group, the court held, “any further analysis of the employer’s right to direct and control is unnecessary ... All that remains to be determined is whether the tort occurred within the scope of employment,” which normally means determining simply whether the plaintiff was a patient of the group. 438 Mass. at 322-23.
Where the existence of an employment relationship is in genuine dispute, however, the court is to consider factors including, but not limited to, “the method of payment (e.g., whether the employee receives a W-2 form from the employer), and whether the parties themselves believe they have created an employer-employee relationship.” Additionally,
the task of determining what constitutes an employer-employee relationship is fact dependent, and that in cases where there is no clear admission of employment, a direction and control analysis may be useful to determine whether the relationship is that of employer-employee as opposed to that of an independent contractor. The right to direct and control the details of an alleged employee’s actions “may be veiy attenuated,” but remains an important factor that should be examined when the employer-employee relationship is contested.
Id. at 322 (citations omitted).
Dias was careful to note that the issue before it did not arise under Chapter 258. Accordingly, the court distinguished Kelley v. Rossi, where it had been “required to determine as a preliminary matter whether a physician was a ‘public employee,’ as defined by the Massachusetts Torts Claim Act statute, G.L.c. 258, §1.” 438 Mass. at 321 (emphasis supplied). This appears to be an instance, in other words, in which specific statutory language has resisted the evolution of the common law, and in which an explicit statutory command — here, to employ the “direction and control” test exclusively— carries the day.[5] Put another way: Kelley’s reliance on a direction and control analysis as the sine qua non of public employment is statutorily compelled, and still sound, although its additional assertion that the issue is governed by the same principles as the common law applies to the doctrine of respondeat superior has now become something of an anachronism.
Turning, then, to the facts of this case: the Affiliation Agreement and the Education Agreement appear, at first blush, to point in opposite directions on the subject of direction and control, assigning it both to the University and to the Medical Center. Read more closely, however, the direction and control language as to the University is either general (as in section 2.2.1 of the Affiliation Agreement and PartlI.EoftheEducaüonAgreement), or is specific to matters relating to the University’s educational mission (as in Part II.D of the Education Agreement). The Medical Center’s supervisory responsibility, by contrast, relates specifically to “patient care and related matters.” (Education Agreement, Part II.G.)
Under familiar principles,
[a] contract is to be construed to give reasonable effect to each of its provisions. “(E]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties.”
J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986).
Additionally, where (as here) two or more contract documents are executed as part of the same transaction, they “must be read together in a sensible way... to give effect to the intention of the parties.” Nedder v. Knapp Shoes, Inc., 32 Mass.App.Ct. 462, 466 (1992), and cases cited, especially Chelsea Indus., Inc. v. Florence, 358 Mass. 50, 55 (1970).
Finally, “(w]here general and specific clauses conflict, the specific clause governs the meaning of the *632 contract.” 11 Richard A. Lord, Williston On Contracts §32.10 (9th ed. 1999).
Reading the Education Agreement and the Affiliation Agreement according to these principles, it seems clear that the specific language of Part II.G of the Education Agreement, placing on the Medical Center responsibility for “immediate, direct supervision of residents” “for patient care and related purposes,” controls over the more general or specifically training-related language pertaining to the University. This only makes sense: while the residents were caring for patients, they were engaged in doing the business of the Medical Center, and it ought to be the Medical Center — which (unlike the University) is directly responsible to those patients — that had the right to direct and control them. Not surprisingly, the contracts so provide.
In actual practice, the supervision provided the residents appears not to have been as “immediate” or as “direct” as one might expect in other settings, not involving highly trained professionals. As is apparent from the factual summary above, the attending physician (Dr. Quinlan) gave only broad direction (to give Mrs. Caranci a course of TPN), with the “manner and means” being left up to the team of residents. This accords with the fact that the residents were licensed physicians and as such, were expected to exercise independent judgment in caring for patients. Kelley v. Rossi, 395 Mass. at 662. Nonetheless, it is the right to control — not necessarily day-to-day supervision — that is “the guiding principle.” Id. at 661. “A house officer, such as a resident, has duties and obligations at a hospital that demonstrate that he or she is a servant. The general rule is that a resident is a servant of the hospital.” Id. at 663.
In short: the contract documents themselves, the overall context in which the residents cared for Mrs. Caranci, and such particulars of that care as appear in the evidence create, at the very least, a genuine issue of fact that stands in the way of a determination, as a matter of law, that they were public employees. Their status appears instead to be that of borrowed servants — recruited, paid, and administered by the University, but on assignment to do the Medical Center’s work, and subject in the relevant particulars to the Medical Center’s direction and control. See Hohenleitner v. Quorum Health Resources, Inc., 435 Mass. 424, 434 (2001) (“Our test for determining borrowed servant status is ‘whether, in the particular service which [the person] is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired’ citation omitted). In any event it cannot be said, as a matter of law on the undisputed facts, that any of the resident defendants was a public employee at the time he or she cared for Mrs. Caranci.

B. The Medical Center’s Motion

What has been said already disposes, as a practical matter, of the Medical Center’s motion as well. Applying the respondeat superior principles articulated in the Dias case: although the Medical Center did not cany the residents as W-2 employees, and notwithstanding its contractual agreement with the University specifying that “[residents are acting as and shall remain employees of the University and shall not, at any time, be considered agents or employees of the Medical Center or its hospitals while performing services under this Agreement,” the Medical Center’s explicit reservation of the right to direct and control the residents in matters affecting patient care “remains an important factor that should be examined when the employer-employee relationship is contested.” 438 Mass. at 322.
Given this clear right, and the fact that such supervision as the residents actually received in caring for Medical Center patients was provided by the attending physician in his capacity as such, it cannot be said that the Medical Center is entitled to judgment as a matter of law.

ORDER

For the foregoing reasons, (1) Defendant, UMass Memorial Center, Inc.’s Motion for Summary Judgment (Paper No. 65), and (2) the Motion of Defendants Venu Pillarisetty, M.D., Weikai Fang M.D., Aaron G. Baggs M.D., Theodore P. McDade M.D. and Susan Mahan M.D. for Summary Judgment (Paper No. 68), are both DENIED.

 I note here that this mling is consistent with at least two recent decisions from this Court which also addressed, on the records submitted in those cases, the status of UMass residents assigned to the Medical center. See Martinez v. UMass Memorial Health Care, Inc., 2006 WL 1646154 (Mass.Super. 2006; Fecteau, J.) (21 Mass. L. Rptr. 103); Mensah v. Goedken, 2006 WL 1075453 (Mass.Super. 2006; Wexler, J.) (21 Mass. L. Rptr. 6).

Total parenteral nutrition, in which the patient receives nourishment in a solution administered in a vein via needle or catheter.

Three different radiology reports from September 21 (of films taken at different times, all read by the same radiologist) all appear to note questions concerning the various line placements. The last one — apparently concerning the same film that Dr. Baggs reviewed — showed the right-sided catheter having been removed and a new one placed on the left side. The new line, notes the report, “resides to the left side of mid line, which could be due to aberrant venous anatomy. It is even more left sided than the right sided line noted previously.”

By law, a resident practices on a limited license issued by the Board of Registration in Medicine.
A limited license authorizes a limited licensee to practice medicine only in the training program or at the health care facility designated on the limited license or at the facility’s approved affiliates. A limited licensee may practice medicine only under the supervision of a full licensee.
243 CMR 2.02(10)(a).

See, for another such instance, Pobliego v. Monsanto Co., 402 Mass. 112 (1988) (declining to import discovery mle into statute of limitations for wrongful death actions, which then provided that action must be brought within “three years from the date of death”: later overruled legislatively by St. 1989, c. 215 §1).